762 A.2d 1161
Supreme Court of Rhode Island.

In re Application of Roger I. ROOTS.

No. 2000–276–M.P.
|
Nov. 20, 2000.

**Synopsis**
Applicant sought admission to bar. The Supreme Court held that recent and past criminal acts, instances of untruthfulness, and a lingering inability of applicant to take requisite attorney's oath in good faith warranted denial of application.

Application denied.

West Headnotes (16)

[1]  **Attorneys and Legal Services**⚖**Review**
Supreme Court will not overturn a recommendation of Court's Committee on Character and Fitness as to whether to admit applicant to bar unless Committee has abused its discretion or its decision is clearly wrong; however, Court will do so if such recommendation is not well founded.

3 Cases that cite this headnote

[2]  **Attorneys and Legal Services**⚖**Application**
Requirement that every prospective attorney complete application that asks for a listing of all the applicant's violations of traffic laws or ordinances other than parking offenses is not superfluous nor a mere incursion into applicant's privacy, and it should not be so considered; rather, it bears a logical and appropriate relationship to ability of a prospective attorney to maintain respect for and to uphold the law. Sup.Ct.Rules, Art. II, Rule 3(e).

[3]  **Attorneys and Legal Services**⚖**Character and fitness**
Although repeated violations of various traffic laws, in isolation, may not preclude a candidate from admission to the bar, they are relevant to moral fitness and good-character determination that must be made when evaluating qualifications of prospective attorneys.

1 Case that cites this headnote

[4]  **Attorneys and Legal Services**⚖**Character and fitness**
Various citations, misdemeanors, and felonies that applicant accumulated over the years, which offenses included resisting arrest with violence and a weapons registration offense, presented sufficient evidence to warrant, at minimum, a significant delay in acting favorably upon his application for admission to bar, especially in light of fact that applicant admittedly ignored and violated terms of his two previous probationary periods.

[5]  **Attorneys and Legal Services**⚖**Character and fitness**
Applicant's award-winning writings, his law-school class rank, his position on student newspaper, and his service on university law review were largely irrelevant in establishing his moral fitness and good character to practice as a member of bar. Sup.Ct.Rules, Art. II, Rule 3(a, f).

1 Case that cites this headnote

[6]  **Attorneys and Legal Services**⚖**Character and fitness**
Mere intelligence and academic achievement do not necessarily equate to moral fitness and good character, both of which are preconditions to becoming a member of bar. Sup.Ct.Rules, Art. II, Rule 3(a, f).

2 Cases that cite this headnote

[7] **Attorneys and Legal Services**⚷**Character and fitness**

Central purpose of requiring character review as part of attorney-admission process is to protect those members of public who might become clients of the practicing lawyer from those attorneys who are so morally or ethically challenged that they are unable to demonstrate the type of good character and moral fitness requisite to serving in a fiduciary capacity.

[8] **Attorneys and Legal Services**⚷**Character and fitness**

Fiduciary position of trust that a lawyer assumes vis-a-vis his or her clients demands that individuals whom Supreme Court admits to bar should be worthy of confidence that members of the public repose in them.

[9] **Attorneys and Legal Services**⚷**Character and fitness**
**Attorneys and Legal Services**⚷**Truthfulness and candor**

Applicant's lack of candor in applying to buy firearms and on bar application about reason for his use of an alias was inconsistent with admitting him to practice law.

[10] **Attorneys and Legal Services**⚷**Oath**
**Constitutional Law**⚷**Admission to bar**

Attorney oath to support Federal and State Constitutions and to support federal and state laws, as well as similar oaths that prospective attorneys across United States were required to take, did not violate any individual constitutional right that bar applicant could have had to express his contrary views. Sup.Ct.Rules, Art. II, Rule 8.

[11] **Attorneys and Legal Services**⚷**Oath**

When candidate for admission to bar has published writings that communicate his or her explicit refusal to accept federal government as legitimate government of country, candidate raises legitimate questions about whether he or she in good faith can take and abide by attorney's oath to support laws and Constitution of United States while in exercise of office of attorney and counselor. Sup.Ct.Rules, Art. II, Rule 8.

[12] **Attorneys and Legal Services**⚷**Oath**

While it is possible to draw and maintain a sharp line between a lawyer's personal beliefs and his or her professional conduct, a predictive assessment of a prospective lawyer's ability to take and abide by attorney's oath is a fair subject for character review when considering applicant for admission to bar. Sup.Ct.Rules, Art. II, Rule 8.

[13] **Attorneys and Legal Services**⚷**Presumptions, inferences, and burden of proof**

Bar applicant bore burden at all times to demonstrate his moral fitness and character to practice as a lawyer in state. Sup.Ct.Rules, Art. II, Rule 3(f).

1 Case that cites this headnote

[14] **Attorneys and Legal Services**⚷**Political beliefs or activities**
**Constitutional Law**⚷**Admission to bar**

First Amendment inhibited both Supreme Court's Committee on Character and Fitness and Supreme Court from denying membership in bar to applicant because of his political beliefs and unorthodox political and social ideas. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

[15] **Attorneys and Legal Services**⚷**Character and fitness**
**Attorneys and Legal Services**⚷**Political beliefs or activities**

Neither a criminal record nor political views of applicant constitute an automatic bar to his or her admission to bar, yet both may be relevant in assessing (1) applicant's candor, honesty, sincerity, and good faith in professing a willingness to take and abide by the requisite attorney's oath, and (2) ability of applicant, in exercise of his or her office as an attorney and counselor, to support Constitution and laws of

United States. Sup.Ct.Rules, Art. II, Rules 3(a, f), 8.

[16] **Attorneys and Legal Services**⚖ Character and fitness
**Attorneys and Legal Services**⚖ Oath

Applicant's prior record, including his criminal past and other conduct demonstrating his lack of candor and truthfulness, cast such doubt upon sincerity of applicant's professed willingness to abide by terms of attorney's oath that he was required to take as a member of the bar that his application would be denied. Sup.Ct.Rules, Art. II, Rules 3(a, f), 8.

1 Case that cites this headnote

**Attorneys and Law Firms**

***1162** Steven M. McInnis, Newport, for Plaintiff.

John D. Lynch, Warwick, for Defendant.
Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

OPINION

PER CURIAM.

This case comes before us on an application by the petitioner Roger I. Roots (petitioner or Roots) seeking admission to the bar of the State of Rhode Island. Roots, who was born in October, 1967, is a 1999 graduate of the Roger Williams University School of Law. Following his law-school graduation, he took and passed the Rhode Island bar examination. In accordance with its usual procedures, this Court's Committee on Character and Fitness (committee) examined Roots's record and interviewed him after he had passed the ***1163** bar examination. Because the committee had serious concerns relating to his character and fitness to become a member of the bar of this state, it conducted a number of hearings to determine whether it would recommend Roots's admission to the bar. As a result of these hearings, the committee in November 1999 voted on his application. The vote of the committee was five in favor of his admission and two opposed.

After this vote, members of the committee circulated memoranda setting forth the views of the majority of the committee and also the views of the minority. The committee conducted a further investigation to determine whether additional information existed that should be taken into account. Upon determining that no additional information, other than that already obtained by the committee, was available, the committee called a meeting for April 12, 2000. Before the date of that meeting, the membership of the committee had changed. One member had resigned and the Attorney General's designee had been replaced. The person who replaced the member who had resigned recused herself from participation in the vote on April 12. The Attorney General's new designee, however, did participate in the vote. The committee then voted, resulting in a recommendation by four members to admit the petitioner and a recommendation by two members to reject his application. Three members of the majority wrote a memorandum in support of their recommendation. One member of the majority presented a separate concurring memorandum that expressed serious doubts about the petitioner's candor and honesty, but nevertheless recommended his admission. The minority members submitted two separate memoranda. The chairman of the committee, who had voted against the admission of petitioner, wrote one memorandum; the Attorney General's designee wrote a separate memorandum.[1]

To avoid an unduly long recitation of the pertinent facts concerning Roots's application, the various reports that the majority and minority members prepared are attached to this opinion and made a part hereof. The report of the majority is appended and marked as exhibit A. The concurring report recommending admission is appended and marked as exhibit B. The minority report that Chairman Steven M. McInnis wrote is appended and marked as exhibit C. The dissenting opinion of the Attorney General's designee is appended and marked as exhibit D. All these reports contain very similar accounts of the factual elements underlying the reports of the members of the committee. Nevertheless, we shall attempt to set forth in this opinion the important facts and circumstances that we believe justify our conclusion.

Through its hearings and by examining the material submitted in support of and in opposition to the application, the committee sought to resolve three major areas of concern about the petitioner: (1) his criminal record; (2) his candor and veracity; and (3) his ability to take and abide by the attorney's oath. Some of the evidence was documentary in nature. In addition, extensive testimony was taken from the petitioner himself. The three areas of concern shall be dealt with separately in this opinion.

### Standard of Review

[1]  We will not overturn a recommendation of this Court's Committee on Character and Fitness (committee) unless it has "abused its discretion or its decision is clearly wrong." *In re Application of Capace,* **\*1164** 110 R.I. 254, 259, 291 A.2d 632, 634 (1972). We will do so, however, if "such recommendation is not well founded." *In re Testa,* 489 A.2d 331, 334 (R.I.1985). Here, the committee's various opinions—three-in-favor-of admission, one concurring, and two dissents—show that the committee itself was sharply divided in its views about whether to recommend the admission of Roots to the bar. Indeed, the opinion of the concurring member who provided the decisive fourth vote in favor of admission (see exhibit B) contains strong reservations about whether Roots should be admitted to the bar at all. Thus, this is not a situation in which the committee was of one mind and then submitted a unanimous and unqualified recommendation to us concerning the admission of a candidate. On the contrary, the committee has submitted multiple opinions with only a bare majority of the committee favoring Roots's admission. And even that majority is tenuous, given the concurring member's strong reservations and the other members' own misgivings about Roots's qualifications. After reviewing these submissions, we are persuaded that the dissenters succeed in showing why the majority's recommendation in favor of admission is not well founded. In any event, the committee's troubled majority vote was far from a resounding endorsement of Roots's admission to the bar. Accordingly, we do not believe that the majority of the committee's recommendation merits the usual deference that we would give to one that was not as clouded by dissents and as hedged around by reservations as is this one.

For these reasons and those discussed below, we are of the opinion that Roots's application should be denied without prejudice to Roots reapplying at some later date after he has proven that he has truly rehabilitated himself.

I

### Petitioner's Criminal Record

In 1985, when he was eighteen years old, Roots was charged with and convicted of shoplifting in the State of Florida. He had relocated there after leaving his home in Montana during his freshman year in high school. In his bar application, Roots admitted that, following his arrest for this crime, he "failed to appear at [his] scheduled hearing on the matter." He conceded that he was aware that he needed to attend the hearing but claims that his immaturity at the time caused him to disregard the court's order. Within two months, however, the Orlando police rearrested him on the same charge. He was then detained until he could be presented to a judge. And even though the court still treated him with leniency, Roots shirked his responsibility to abide by the terms of his probation when he failed to perform the community-service condition of his sentence. (He admitted in his application to the bar that he just "left Orlando without performing the community service.")

Within a year, however, he was arrested again in Florida and convicted of yet another crime, the felony of resisting arrest with violence. Generally, this crime involves disobeying, with the use of force (as opposed to mere flight), a police officer's lawful attempt to arrest an alleged criminal. *See* Fla. Stat. Ann. § 843.01 (West 2000). As reflected in the police report and in Roots's law school application, the alleged facts of the crime reveal that Roots's truck had collided with another vehicle. A police officer arrived at the accident scene and an argument ensued between Roots and the officer. When the officer learned that Roots had failed to pay two fines for separate moving violations and was driving on a suspended license, he attempted to take Roots into custody but Roots physically resisted the arrest. Although a federal sentencing judge would later characterize this

incident as minor because, in attempting to subdue Roots, the police officer struck the only actual blow, a Florida sentencing judge, who presumably was more familiar with the relevant facts and circumstances, ultimately *1165 sentenced Roots to fifty-one weeks in prison following his *nolo contendere* plea after he again violated his initial three-year-probation sentence.[2]

The petitioner then left Florida and moved to Wyoming, where he attended the Northwest Community College in Powell, Wyoming. While there, he exhibited in class a homemade air gun that he had constructed. (This may have been part of a speech presentation.) Because the authorities knew that petitioner had a prior record, they searched his dormitory room. There, they found additional weapons, including an automatic pistol, an automatic rifle with approximately 500 rounds of ammunition, and an assault rifle described as an AK–47. The petitioner was charged in federal court with being a felon in possession of firearms and with the possession of an unregistered firearm in violation of various federal statutes. Pursuant to a plea agreement, petitioner pled guilty to the registration count (relating to the air gun).[3] The other counts were dismissed. A federal judge sentenced petitioner to twenty months in federal prison on January 10, 1992. This sentence terminated on April 4, 1993. As previously mentioned, the federal judge indicated that the petitioner's felony conviction for resisting arrest with violence in Florida was not as serious an offense as might appear on the surface since the only injury was to the officer's hand when he struck the petitioner in the face. Nevertheless, it was established that in purchasing the various weapons, the petitioner had filled out a number of forms in which he had misrepresented his status as a person convicted of a felony in Florida.

The applicant's criminal record also includes the following:

(1) On at least eight occasions from the spring of 1986 to as recently as the winter of 1997, Roots was caught speeding and ordered to pay fines. These moving-traffic violations occurred in Utah, Washington, and Montana.

(2) Roots apparently ignored his previous driver's license suspensions and flouted these dispositions because he later was charged in Georgia not once but twice in 1989 for driving on a suspended license. On the first occasion he not only drove on a suspended license, but also was issued citations for driving without a license, without insurance, and without proper registration. On the second such occasion, he was again driving on an expired registration plate and a suspended license. Roots's bar application explains his conduct thus:

> "I was without sufficient money for insurance or registration. I made it to work for several days but was pulled over by another officer only a couple days later. Again, I was arrested for driving without a license, registration, or insurance. * * * To this day I do not know what became of the cases in Georgia."

*1166 On the present record, we do not know whether Roots has satisfied whatever lawfully imposed fines he was obliged to pay in Georgia. Apparently, he has not inquired about what present responsibilities—or possible warrants for his arrest based on his failure to resolve these matters—he still may have outstanding in Georgia.[4] Nothing in the record shows that Roots has resolved these matters. Moreover, even if Roots formerly lacked sufficient funds to pay for his automobile insurance or registration, he should have arranged to use public transportation or pursued other alternatives (for example, carpooling with friends or co-employees), rather than driving continuously on a suspended or revoked license as he did when he was caught doing so on three separate occasions.

[2] [3] Every prospective attorney in this state must complete an application that asks for a listing of all the candidate's "violations of * * * traffic law [s] or ordinance[s] other than parking offenses." Committee on Character and Fitness, *Petition/Questionnaire for Admission to the Rhode Island Bar* 13 (2000). *See also* S.Ct. R. Art. II, Rule 3(e) ("[p]ersons seeking admission to the practice of law shall * * * file with the Committee on Character and Fitness and with the Clerk of the Supreme Court the petition and questionnaire on a form to be furnished by the Clerk"). This part of the application is not superfluous nor a mere incursion into the applicant's privacy, and it should not be so considered. Rather, it bears a logical and appropriate relationship to the ability of a prospective attorney in this state to maintain respect for and to uphold the law. And although repeated violations of various traffic laws, in isolation, may not preclude a candidate from admission to

the bar, they certainly are relevant to the moral fitness and good-character determination that must be made when evaluating the qualifications of prospective attorneys.

(3) In Florida, Roots was convicted of providing a false statement to the authorities. To be sure, Roots has admitted that he provided a false name, but it should go without saying that this crime also reflects upon a candidate's ability to serve the public as an attorney, as well as upon the applicant's candor and truthfulness.

[4] In their totality, these various citations, misdemeanors, and felonies that Roots has accumulated over the years present sufficient evidence to warrant, at minimum, a significant delay in acting favorably upon his application for admission to the Rhode Island bar, especially in light of the fact that Roots has admittedly ignored and violated the terms of his two previous probationary periods. Indeed, Roots's first probation required him to perform community services—yet he chose to ignore that mandate from the Florida court. Instead, it was only after he scuffled with an arresting police officer—itself a display of disobedience to the officer's attempt to effect a lawful arrest—and again disobeyed the terms of his probation, that Roots was ultimately forced to serve time in prison.

[5] [6] We recognize that Roots has not been convicted of violating any criminal laws since his conviction on the federal weapons charge and since his release from prison in 1993 after serving his federal jail sentence of twenty months. We also acknowledge and commend Roots's award-winning writings, his law-school class rank, his position on the student newspaper, and his service on the Roger Williams University Law Review. On the other hand, while these more recent accomplishments are indeed praiseworthy, they are largely irrelevant in establishing his moral fitness *1167 and good character to practice as a member of our bar. Indeed, no one has sought to disqualify Roots based on his academic incompetency or lack of intelligence. On the contrary, his record in this regard is conceded to be outstanding. But even some notorious criminals can point with pride to their relative intelligence. Thus, mere intelligence and academic achievement do not necessarily equate to moral fitness and good character, both of which are preconditions to becoming a member of our bar. See S.Ct. R. Art. II, Rule 3(a) ("[a]ll persons who desire to be admitted to practice law shall be required to establish their moral character and fitness to the satisfaction of the Committee on Character and Fitness of the Supreme Court of Rhode Island in advance of such admission,"); S.Ct. R. Art. II, Rule 3(f) ("[a]ny person who seeks to practice law in the State of Rhode Island shall at all times have the burden of proving his or her good moral character before the Committee on Character and Fitness and the Supreme Court of Rhode Island").

Notwithstanding these more recent positive factors, it is our belief that we have not yet had enough opportunity to conclude that Roots has totally rehabilitated himself, especially because his conduct during the years leading up to and including the filing of his bar application raises further questions about the depth, scope, and extent of his alleged rehabilitation. Indeed, his probationary status on the federal-weapons conviction expired only a mere four years ago, after which he then enrolled in law school and continued to engage in activities that cast doubt on his candor, truthfulness, and ability to take the attorney's oath in good faith.

II

**The Petitioner's Lack of Candor and Truthfulness**

It has been established that the petitioner was not truthful in applying for the purchase of firearms. It also has been established that petitioner was not truthful in answering a question on the bar application about the use of aliases, although he did admit to having used three aliases: Carl Davis, Rodger Roop, and Roger Bell. He indicated on his application that these aliases were used for the purpose of attending school, writing, and telephone fundraising. In his testimony before the committee, however, he admitted that the use of the alias Carl Davis was to help him evade the law after he was indicted for the weapons charge in Montana. When he assisted in a senatorial campaign, he also used another alias, Roger Bell, in order to hide his true identity when salary payments were made to him. The minority report that Chairman McInnis submitted concluded that Roots's lack of candor in this respect would not be consistent with allowing petitioner to practice law.

[7] [8] We have recently affirmed that "[t]he attorney-client relationship is 'one of mutual trust, confidence, and good will,' in which the attorney 'is bound to * * * the most scrupulous good faith .' " *DiLuglio v. Providence Auto Body, Inc.,* 755 A.2d 757, 769 (R.I.2000) (quoting *Peirce v. Palmer,* 31 R.I. 432, 450, 77 A. 201, 209 (1910)). A central purpose of requiring character review as part of the attorney-admission process is to protect those members of the public who might become clients of the practicing lawyer from those attorneys who are so morally or ethically challenged that they are unable to demonstrate the type of good character and moral fitness requisite to serving in a fiduciary capacity. As Mr. Justice Frankfurter once observed, lawyers stand

> " 'as a shield' * * * in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.' " *Schware v. Board of Bar Examiners* ***1168** *of New Mexico,* 353 U.S. 232, 247, 77 S.Ct. 752, 761, 1 L.Ed.2d 796, 806 (1957) (Frankfurter, J., concurring). *See also* Deborah L. Rhode, *Moral Character as a Professional Credential,* 94 Yale L.J. 491 (1985).

The fiduciary position of trust that a lawyer assumes vis-à-vis his or her clients demands that individuals whom this Court admits to the bar should be worthy of the confidence that members of the public repose in them. An equal and complementary concern is to safeguard the administration of justice from those who might subvert it through misrepresentations, falsehoods, or incomplete disclosures when full disclosure is necessary. *See* Donald T. Weckstein, *Recent Developments in the Character and Fitness Qualifications for the Practice of Law: The Law School Role; The Political Dissident,* 40 Bar Exam. 17, 23 (1971).

As we have noted previously, Roots was not truthful in applying to buy firearms. Indeed, he repeatedly checked a box indicating that he was *not* a convicted felon when he applied for his gun purchases, despite previously having been convicted of a felony. Thereafter, Roots was convicted for violently resisting arrest, and ultimately spent close to a year in prison for that offense after violating his initial three-year-probation sentence. He was also well aware of his convictions at the time he applied to buy his various assault weapons, yet he failed to disclose them.

Furthermore, Roots admitted to the committee that he was less than forthcoming on his bar application about the reason for his use of the "Carl Davis" alias. Significantly, Roots submitted this untruthful application for admittance to the bar *in 1999.* When pressed about this discrepancy, Roots was unable to reconcile these contradictory statements.

Moreover, as mentioned above, Roots already had been convicted criminally of providing a false statement to the authorities. Such a record of dishonesty, combined with Roots's other criminal misconduct and recent fabrication on his bar application, appears to us to justify at least a several-year delay before Roots's application even should be considered again for his possible admission to the bar. And Roots's use of an alias to mask his "unsavory" connections to white supremacy groups while working for the Committee to Reelect Conrad Burns, and his use of false indorsements on his paychecks, are simply further reasons for this Court to deny Roots's application at this time.

[9] In sum, then, we agree with the minority report that this applicant's lack of candor is inconsistent with admitting him to practice law at this time.

### III

**Ability to Abide by the Attorney's Oath**

Pursuant to Article II, Rule 8 of the Supreme Court Rules, "[e]very person who is admitted as attorney and counselor at law shall take in open court the following engagement:"

> " 'You solemnly swear that in the exercise of the office of attorney and counselor you will do no falsehood, nor consent to any being done; you will not wittingly or willingly promote, sue or cause to be sued any false or unlawful suit; or give aid, or consent to the same; you will delay no man's cause for lucre or malice; you will in all

respects demean yourself as an attorney and counselor of this court and of all other courts before which you may practice uprightly and according to law, with fidelity as well to the court as to your client; and that you will support the constitution and laws of this state and the constitution and laws of the United States. So help you God.' "

[10] Beginning in 1993 petitioner has published a number of articles—including articles as recent as 1998—that express explicit racial and ethnic bias as well as contempt and disdain for the federal government **\*1169** as a "Zionist [O]ccupation [G]overnment." His 1993 article is entitled "100 Truths and One Lie" and purports to establish that members of the black race are inferior to members of the white race. Excerpts from this work are set forth in the minority report. Moreover, as recently as 1998, Roots has written that he disavows the "de[ ]facto" regime of the United States government, its laws, and, apparently, its Constitution. Similarly, he has written in support of the bogus liens that the Freemen in Montana have attempted to place on federal officials who, in his opinion, have violated certain dictates that the Freemen espouse. It is noteworthy that Roots expressed these views in writing even while he was attending law school in 1998. Roots, however, now attempts to retreat from that stance. He would now have us believe that, consistent with the oath all prospective attorneys must take, he now can swear that he will support the constitution and the laws of this state as well as those of the federal government. This oath, as well as similar oaths that prospective attorneys across the United States must take, does not violate any individual constitutional right that Roots may have to express his contrary views. See *Law Students Civil Rights Research Council, Inc. v. Wadmond,* 401 U.S. 154, 161, 91 S.Ct. 720, 726, 27 L.Ed.2d 749, 757 (1971) (holding that the requirement that an attorney be able to take and abide by the oath to uphold the constitution and the laws of the United States is constitutional).

[11] [12] [13] At the same time, the United States Supreme Court has stated that "[c]itizens have a right under our constitutional system to criticize government officials and agencies. * * * Government censorship can no more be reconciled with our national constitutional standard of freedom of speech and press when done in the guise of determining 'moral character,' than if it should be attempted directly." *Konigsberg v. State Bar of California,* 353 U.S. 252, 269, 77 S.Ct. 722, 731, 1 L.Ed.2d 810, 823 (1957). Thus, we have no intention or desire to censor or to punish Roots for his past or present political views or for exercising his rights of free speech. Nevertheless, when as here, a candidate for admission to the bar of a state has published writings that communicate his or her explicit refusal to accept our federal government as the legitimate government of this country, such a candidate raises legitimate questions about whether he or she in good faith can take and abide by the attorney's oath to support the laws and the constitution of the United States while in the exercise of the office of attorney and counselor. For example, if a candidate for admission to the bar were to express the view that, in his or her opinion, the laws and constitution of the United States were illegitimate and, for that reason, unsupportable, but that in the exercise of his or her office as an attorney or counselor, he or she still could and, therefore, would swear to support that constitution and those laws, then the committee and this Court would be entitled, we believe, to view that candidate's professed oath-taking ability with some degree of skepticism—especially if the candidate were a convicted felon with a history indicating a recurring lack of truthfulness and candor. While it is possible to draw and maintain a sharp line between a lawyer's personal beliefs and his or her professional conduct, a predictive assessment of a prospective lawyer's ability to take and abide by the attorney's oath is a fair subject for character review when considering an applicant for admission to the bar. Here, Roots bore the burden at all times to demonstrate his moral fitness and character to practice as a lawyer in this state. See S.Ct. R. Art. II, Rule 3(f). But his recent 1997–1998 publications and comments disavowing the legitimacy of our federal government—especially when considered in light of his criminal record and history of other misconduct indicating a lack of forthrightness and candor—give us pause in accepting his avowal to us that he can now in good faith take and abide by the requisite attorney's oath.

**\*1170** [14] [15] Nevertheless, in reaching this conclusion, we agree with the majority of the committee that the First Amendment inhibits both the committee and this Court from denying membership in the bar to the petitioner because of his political beliefs and unorthodox political and social ideas. See *In re Stolar,* 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971); *Baird v. State Bar of Arizona,* 401 U.S. 1, 91

S.Ct. 702, 27 L.Ed.2d 639 (1971); *Konigsberg v. State Bar of California,* 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957); *Schware v. Board of Bar Examiners of New Mexico,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). All of these cases related to applicants who either were or had been at one time members of the Communist Party or refused to answer questions relating to their membership in an organization (presumably the Communist Party) that advocated the violent overthrow of the government of the United States. We also recognize, as did the majority members of the committee, that neither a criminal record nor the political views of an applicant constitute an automatic bar to his or her admission. Yet both may be *relevant* in assessing (1) the applicant's candor, honesty, sincerity, and good faith in professing a willingness to take and abide by the requisite attorney's oath, and (2) the ability of the applicant, in the exercise of his or her office as an attorney and counselor, to support the constitution and laws of the United States. See *Law Students Civil Rights Research Council Inc.,* 401 U.S. at 156, 91 S.Ct. at 723, 27 L.Ed.2d at 751; *In re Converse,* 258 Neb. 159, 602 N.W.2d 500, 506 (1999).

The petitioner has stated to the committee and to this Court that he will not only take the attorney's oath if admitted to the bar, but that he will abide by it. He stated unequivocally under oath to this Court that he would not discriminate against any person for racial or ethnic reasons. He further stated that he would abide by the lawyer's oath in all respects without any mental reservation or purpose of evasion. And he has stated to the committee that he no longer entertains his extremist views on the illegitimacy of the government of the United States.

[16] We are of the opinion, however, that the prior record of the petitioner—including his criminal past and the other conduct referenced above demonstrating his lack of candor and truthfulness—casts such doubt upon the sincerity of Roots's professed willingness to abide by the terms of the oath that he must take as a member of the bar of this state that his application should be denied at this time.

**Conclusion**

For the above reasons, we conclude that Roots's application to the bar should be denied. The record in this case reveals far too many recent and past criminal acts, instances of untruthfulness, and a lingering inability of this candidate to take the requisite attorney's oath in good faith. Thus, we cannot endorse Roots's admission to the bar of this state at this time. Nevertheless, our denial of his application shall not preclude the possibility of Roots reapplying for and obtaining approval of his admission to the bar at some later time, but no sooner than two years from the date of this opinion. Moreover, if Roots reapplies for admission to the bar of this state within three years from the date of this opinion, he shall not be required to retake the bar examination. However, in addition to satisfying the committee's usual criteria, he shall be required to demonstrate to the satisfaction of the committee and, ultimately to this Court, that, during the period between the date of this opinion and his reapplication:

1. He has secured and maintained gainful employment;

2. He has kept the peace and been of good behavior;

3. His writings and other conduct are consistent with his ability to take the attorney's oath in good faith;

*1171 4. His previous motor vehicle and driving violations and any resulting sanctions in the states of Georgia and Utah have been satisfied and are no longer outstanding;

5. He has performed *pro bono publico* services of a substantial and continuing nature;

6. His post–1993 conduct and achievements outweigh the misconduct and other detrimental factors detailed in this opinion and, thus, are better indications of his moral character and fitness to practice law than his previous misconduct.

Accordingly, we hereby deny Roots's application without prejudice to his reapplication at some later time (no sooner than two years) when a more accurate and adequate assessment of Roots's professed rehabilitation can be undertaken.

EXHIBIT A

*Report of the Committee on Character and Fitness Regarding Roger Roots*

Roger Roots is a recent graduate of Roger Williams Law School and an applicant for admission to the Rhode Island Bar. Mr. Roots has a problematic history which has necessitated an investigation and a hearing into his moral character and fitness as required by Article II, Rule 3. On the one hand, Mr. Roots has an exemplary record in college and in law school. On the other hand, for a period of some five years ending in 1990, he exhibited gross disrespect for the law, which disrespect was exacerbated by a stream of extremist writings, some of which have continued into the near past. In large measure, resolution of Mr. Roots' candidacy boils down to a question of whether one should emphasize the pre–1991 Mr. Roots or the man who post-dates that period. The issue is compounded by the First Amendment implications of considering content of his numerous political writings, some of which have attacked our system of laws and others of which have been on occasion blatantly racist.

On balance, a majority of the Committee on Character and Fitness (the Committee) believe Mr. Roots should be given the benefit of the doubt, and that the decision here should be made on the basis of his actions, not his political opinions.

*1985–1990*
Roger Roots grew up in rural Montana. He left home in 1985, the spring of his freshman year in high school. For the next several years, he criss-crossed the country, supporting himself as an itinerant worker while at the same time obtaining his G.E.D. He ran afoul of the law in Florida in 1985, first with a shoplifting charge, and then, having ignored the terms of his probation, with a series of probation violations which culminated in a resisting arrest charge, a felony under Florida law. For this final offense, he was first held, and later violated on his probation for failure to report. He ended up serving a total of some 51 weeks in prison.

On his return to the West, Mr. Roots attended Northwest Community College in Powell, Wyoming. There he was arrested and charged by the federal government with being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and with the possession of an unregistered firearm in violation of 26 U.S.C. §§ 5845(e), 5861(d), and 5871. He pled guilty to the registration count. On January 10, 1992, he received a the sentence mandated by the Federal Sentencing Guidelines: 20 months in federal prison terminating on April 4, 1993.

The count of conviction, the registration count, involved a homemade weapon which apparently was constructed as part of a class project. The dismissed counts, however, involved the possession of substantially more serious armament: an AK–47 rifle, a 12 gauge shotgun, a .38 caliber revolver and a .22 caliber semi-automatic rifle. In obtaining several of these weapons, Mr. Roots was required to fill out ***1172** forms on which he misrepresented his status as a Florida felon.

At several points during this period Mr. Roots briefly used an alias. There is no indication that his purpose was to facilitate further violations of the law.

The Committee views this conduct as serious and potentially disabling to his candidacy. The Committee recognizes, however, that all of this conduct occurred during a five year period which ended approximately a decade ago. At the time Mr. Roots was a very young (and apparently very angry) young man. The Florida charges, particularly the felonious resisting arrest, may well have overstated the seriousness of the actual conduct, as indeed the federal judge who sentenced Roots on the weapons charge explicitly found.[1] As for the weapons charges themselves, they apparently resulted from some kind of far-right survivalist gesture designed to assert a citizen's right to possess weapons, including essentially military weapons, before such possession was banned by the Government. The Committee has received no evidence of a more traditional criminal purpose.

Rhode Island has never made conviction of a felony an absolute bar to the practice of law. Several persons have been admitted to practice here even after conviction of violent felonies. The Committee views the continuing nature of Mr. Roots' offenses to be serious. In particular, the Committee is concerned about the misrepresentations on the gun applications. On the other hand, the Committee has no evidence that Mr. Roots has done anything illegal for a full

decade. Given this lapse of time and the intervening events, the Committee does not believe that his criminal conduct by itself renders Mr. Roots ineligible.

*Extremist Positions*

Mr. Roots has a substantial history of advocating far-right survivalist-type views. He has made statements which directly disparage the rule of law, using such inflammatory phrases as "the Zionist occupation government" and the like. At times, his writings have included explicitly racist statements. Mr. Roots has testified that many of his more extreme statements grew out of angry ignorance, before he had ever been to college; and that college and law school have moderated his views, although they remain at the far right end of the political spectrum.

The Committee believes that any weighting of an applicant's political beliefs is fraught with constitutional peril. The Supreme Court has observed that " 'mere unorthodoxy [in the field of political and social ideas] does not as a matter of fair and logical inference negate 'good moral character' ' ". *Schware v. Board of Bar Examiners of the State of New Mexico,* 353 U.S. 232, 244, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), quoting brief with approval. Further, under the First Amendment, "views and beliefs are immune from bar association inquisitions designed to lay a foundation for barring an applicant from the practice of law." *Baird v. Arizona,* 401 U.S. 1, 8, 91 S.Ct. 702 (1971). In particular, the State cannot "penalize [a bar] petitioner solely because he personally ... 'espouses illegal aims' ". *In re Stollar,* 401 U.S. 23, 28–29, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971).

The Committee acknowledges there may be circumstances where the First Amendment will not prevent this Court from assessing communications or conduct which bear on the fitness to practice law. *See, Konigsberg v. State Bar of California,* 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957) recognizing that advocacy of the violent overthrow of the government may warrant bar rejection. Similarly, ***1173** Rule 8.4(d) of the Rules of Professional Conduct requires that an attorney not engage in conduct prejudicial to the administration of justice which includes but is not limited to "harmful or discriminatory treatment of litigants, jurors, witnesses, lawyers, and others based on race, nationality, or sex." Presumably disciplinary action could be taken for conduct violating this Rule. But any foray into this area based upon speech alone is problematic. As the Supreme Court has noted, the requirement of "good moral character" is "unusually ambiguous" and being "easily adapted to fit personal views and predilections, can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law." *Konigsburg, supra* at 263, 77 S.Ct. 722.

Roger Roots has been involved in extremist political activity. He has flirted with aggressive anti-system views and has made explicit racist statements, although the latter appear to date back to his period of imprisonment in 1992. Certain of his statements are sufficiently extreme to cause one to doubt the soundness of his judgment. However, to do so in this context is to penalize him for the content of his views, precisely what the First Amendment prohibits. Consequently, and in the absence of recent *conduct* demonstrating unfitness, the Committee believes that Mr. Roots' extremist writings do not rise to the level that should require this Court to press the constitutional envelope by excluding him from the practice of law.

The Bar loses as well as gains when the fringes of diverse opinion are excluded from its membership. "We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes." *West Virginia State Board of Education et al. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The Committee believes that neither the Bar nor the Court is so fragile that it cannot survive an attorney whose politics may be outlandish or even egregiously offensive. As an attorney, Mr. Roots will have an ethical obligation to abide by Rule 8.4. He has stated in sworn testimony that he will be able to do so. He has also testified that he can and will support the laws and Constitution of Rhode Island and the United States, all of which proscribe discrimination on the basis of race. The Committee is not able to forecast his inability to live up to this obligation. *See, Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966)(precluding use of political speech as a basis for challenging sincerity of person swearing to uphold Constitution); *cf., Law Students Research Council, Inc. v. Wadmond,* 401 U.S. 154, 167, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971)(acknowledging the wisdom of using deterrent and punitive effects, such as post-

admission sanctions, as the principal means of policing attorney conduct).

### 1994–2000

Mr. Roots was released from federal prison on April 4, 1993. Since that time, his achievements have been impressive. He graduated at the very top of his class in college. In law school he was a member of the Law Review, the executive editor of the student newspaper, and the student president of the school's chapter of the Federalist Society for Law and Public Policy studies. He has won several national writing competitions and has graduated near the top of his law school class.

Two deans of Roger Williams Law School testified on his behalf, Deans Cogan and Harrington. Both stated that Mr. Roots has been an active and valuable member of the law school community. Both stated that he has been a very motivated student, always prepared and always ready to help his fellows. They made these statements knowing of his criminal record, which he had disclosed on his law school application forms. They were not conversant, however, with his past extremist political writings. Both stated their belief that, if given the opportunity, Mr. Roots would prove to be a credit to the Bar.

### *1174 Candor Before the Committee

Mr. Roots fully disclosed both his criminal record and his past use of aliases on the Bar questionnaire. He did not disclose his political writings, but he was not asked to do so. In the course of the hearing, questions arose concerning Mr. Roots' candor in answering certain questions on his law school application, particularly those relating to past employment—a failure to list his position as correspondent to a far-right newspaper as a job and the reasons for his termination from a senatorial campaign. The Committee concludes that Mr. Roots was not being deliberately evasive on these points.[2]

Mr. Roots promptly furnished the Committee with any and all materials requested. His file is now voluminous with the materials which he supplied. Appearing before the Committee, he was not a carefully prepared witness. Many of his answers seemed confused, as he groped for explanations of decade-old aberrant behavior. He did not, however, appear consciously untruthful. The Committee can find no substantial evidence which would support the conclusion of lack of candor.

### Conclusion

For these reasons, the Committee concludes that Mr. Roots meets the minimum requirements for the admission to the practice of law and recommends to this Court that it admit him to the Bar of the State of Rhode Island.

EXHIBIT B

### CONCURRING REPORT TO THE SUPREME COURT ON THE APPLICATION OF ROGER ROOTS

I write this separate report to the Court because, while I agree with the majority that neither Mr. Roots' personal beliefs nor his past criminal convictions should disqualify him from being a member of the bar, I cannot fully agree with their assessment of his credibility and candor before this Committee.

I, like the majority, question whether an applicant's political or personal opinions should disqualify him from membership in the bar, so long as they do not manifest themselves in illegal, unethical or otherwise improper conduct. Furthermore, I join with the majority in the belief that Mr. Roots' past criminal conduct should not, by itself, disqualify him from the practice of law, given the nature of his crimes and the time that has passed since they were committed. During my tenure, the Committee has been especially concerned with crimes involving theft or dishonesty. An attorney is often placed in a position of trust where the only real protection his client or the public has from an abuse of that trust is the attorney's own integrity and sense of honesty. Although the method Mr. Roots used to commit his last crime, lying on gun applications, and the method he used to avoid prosecution, use of aliases, certainly involved dishonest conduct, the underlying crimes did not.

In reviewing Mr. Roots' criminal record in preparation for his testimony, I did not perceive his crimes as demonstrating a dishonest heart so much as a disregard for any law which was inconvenient for him or conflicted with his political beliefs or personal desires. This attitude appeared to manifest itself when he argued with the police officer in Florida, decided to leave Florida rather than comply with the requirements of his probation, and lied on several gun applications so he could purchase the weapons that he wanted.

**\*1175** In the documents he submitted and his testimony, I hoped to see some indication that he realized that the law was more than just something to be ignored or gotten around when inconvenient or in conflict with his personal beliefs or desires. I was also hoping for candor from Mr. Roots and, as a Committee member, I believe, I was entitled to receive it. Despite his protestations of candor and production of voluminous records, I, like the minority, do not believe that Mr. Roots was fully open and frank with us. The documents he submitted as part of his application at several points provided only half truths, e.g. his characterization in his bar application of the reasons for his use of aliases, his omission from his law school application of his attendance at the very school at which he was arrested and later convicted of having possession of a firearm (whether seized from a school dormitory or his apartment, as stated in the bar and law school application, is not clear), and his mischaracterization of the reasons for his being terminated from the senator's campaign.

In reviewing the recommendations before the hearing, I questioned whether Mrs. Justice Goldberg was truly aware of Mr. Roots' political beliefs listing Adolph Hitler, among others, as evidence of the superiority of the white race, and likening the physical characteristics of African Americans to apes, R. Roots, "100 Truths and One Lie" (1993?), and supporting the Freemen's right to operate their own judiciary, complete with the issuance of liens on the property of public officials, Roger Roots, "Five Freemen Convicted One Acquitted in Federal Show Trial," *The Jubilee Newspaper,* Vol.10 No. 4, April 13, 1998, "How Strong Is The Case Against the Freemen?" *The Jubilee Newspaper,* Vol. 9, No. 3 (1997 or 1998). I also wondered if Mr. Wiernusz had truly read much that Mr. Roots had written. In fact, Mr. Roots admitted that Ms. Justice Goldberg was not aware of his political/social beliefs, which he said he had held in the past. Neither was Mr. Wiernusz aware of any of his Freemen or racial writings, but only his law school articles.

I do not know if these people would have recommended Mr. Roots if they were as fully aware of his writings and personal beliefs as they thought they were, but it does concern me that Mr. Roots offered recommendations of two people who were misinformed about issues of which they represented they were aware. I do not know whether Mr. Roots knew the content of the recommendations of Mrs. Justice Goldberg and Mr. Weirnusz before they were submitted, but if he did, I believe his actions were misleading to the committee and disservice to his employer and friend.

I questioned Mr. Roots as to whether he believed that there should be an extra judicial system and whether the Freemen had the right to file liens that they issued themselves. His answer was that he did not.[1] I find it difficult to reconcile his answer at the hearing with his published writings as recently as 1997 and 1998.[2]

**\*1176** When Mr. Roots asked if there was further information he could provide, I explained that my concern was with his candor and credibility. His response was to immediately deny testimony which he had clearly given just a few minutes before, causing his attorney to stipulate that he had testified to that effect.

I cannot go so far as the dissent in characterizing some of these statements as flat out lies but I certainly was left with the impression that documents submitted in support of his application and his testimony contained a number of half-truths and evasive answers. It appeared that he was trying to soften the hard facts of his criminal record and avoid inquiry into his political/ social writings, by evasive, incomplete or misleading statements. Nevertheless, Mr. Roots certainly did disclose his criminal record in detail and, although he did not disclose his political or social beliefs, he was not asked to do so. Moreover, anyone of the instances I described above would not cause me to vote against his application. I recognize that on paper Mr. Roots has made a significant effort to rehabilitate himself and that successful rehabilitation is a goal of the criminal justice system. Mr. Roots pleaded passionately before the Committee that he be given an opportunity to work as an attorney on behalf of

prisoners in need of representation. If Mr. Roots had been as frank as the majority felt he was, he would have made my decision much easier.

Weighing all of these factors, I join with the majority in recommending his admission to the bar, however, I do so with significant doubt as to the wisdom of my decision, and therefore I, like the minority, would urge the court to view Mr. Roots' entire record and interview him carefully to determine whether it believes he has the character and fitness to be a member of the bar.

Respectfully submitted,

Brendt W. Anderson

EXHIBIT C

### MINORITY REPORT APPLICATION OF ROGER ROOTS

To: Supreme Court of Rhode Island

Re: Bar Application of Roger Roots
This letter is written as a dissenting report to the majority vote of the Committee regarding Mr. Roger Roots. Unlike the majority, I believe that the Court should deny admission to the Bar to Mr. Roots. The basis for this belief is threefold:

I. Criminal Record. Mr. Roots has been convicted of various misdemeanors and two felonies. The last conviction resulted in his incarceration in a Federal penitentiary for a term ending in 1993, the year he returned to college and only three years before entering law school. His probation period ended in 1996.

II. Untruthfulness. Mr. Roots has affirmatively lied on his law school application and his application for admission to the Bar, and I believe has carefully avoided disclosing aspects of his past which may rise to the level of tacit untruthfulness. He also, by his own admission, lied on the gun permit applications by affirming that he had not been convicted of a felony.

III. Mr. Roots' views on the legal system, as evidenced by his publications. I believe that the Committee's charge to inquire into a candidate's moral character and fitness to practice law encompasses a reasonable review of the candidate's attitudes and opinions *1177 on social issues, to the extent that such views may reflect on his or her ability to take in good conscience and uphold the oath required of all attorneys or on his or her ability to practice law in accordance with the equitable principles enunciated in our rules of professional responsibility. Mr. Roots' writings evidence to me a severe deficiency in this regard.

The record transmitted to the Court contains the full written documentation bearing on the above matters. However, I would like to summarize the contents of some of those documents that relate to my concerns.

*Criminal Record.* The file discloses many arrests and convictions while Mr. Roots led a basically itinerant life in Florida and other southern states. These occurred when Mr. Roots was young, in some cases in his teens. As the majority of the Committee has noted in its deliberations, taken individually these matters may seem remote in time and relatively minor in severity. However, the last conviction was for a felony, resisting arrest, and in his testimony Mr. Roots conceded that he knew or should have known that the conviction was a felony which would remain on his record if he did not complete his probation. Mr. Roots then fled the jurisdiction and returned to Montana, his home state, and therefore did not complete his probation in Florida. Despite that fact, Mr. Roots obtained numerous weapons the possession of which is prohibited, by federal law, to convicted felons. Mr. Roots testified that he obtained these weapons at various times from various dealers, and that he was required to sign a form at each dealership attesting to the fact that he was not a convicted felon. Each time Mr. Roots falsely replied "No" on the form, and concedes now that he probably knew at the time that the statement was false, and certainly knows it now. It is also worth noting that these weapons were not ordinary handguns; they consisted of an automatic pistol, an automatic rifle with at least 500 rounds, and an assault rifle commonly known as an AK47.

When Mr. Roots exhibited in a college class a homemade air gun that he constructed, the authorities, apparently

knowing that he was a convicted felon, raided his dorm room and found the air gun and also the additional weapons. Ultimately, Mr. Roots pleaded guilty to a single charge concerning the air gun, and the remaining charges were dropped. He conceded in his testimony that the other weapons were present and were seized, and that possession of them violated the law as well as the weapon for which he pleaded guilty. Mr. Roots then served time in federal prison, was released in 1993. His probation ended in 1996, while he was in law school.

I believe that the series of convictions is a serious matter. There was no good reason for Mr. Roots to possess such a number of high-powered weapons; in fact, in his testimony before the Committee he could not come up with a coherent reason for purchasing the weapons. Doing so knowingly as a convicted felon is inexcusable, in my view, and should be a bar to his becoming an attorney.

*Truthfulness.* Mr. Roots was untruthful in at least three areas.

The first concerns an item on his law school application regarding previous employment. The question asks for previous employment and the reason for ceasing employment. Mr. Roots listed a job with the Committee to Reelect Conrad Burns (a Senator from Montana) and he stated that the reason for leaving was a conflict with his school schedule. In fact, he was terminated from the job because of his unsavory associations with white supremacist activists. He **\*1178** not only admits this now, but also published several letters to the editor to the local newspaper at the time which bemoaned his firing for that reason. These letters to the editor were also untrue in some respects. He states in them that the reason for his firing was that the Young Republicans at his college, a group that he founded, had a Ku Klux Klan activist as a member, whom Mr. Roots says in his letter to the editor that he barely knew the man. That is untrue; he in fact befriended the man at college, and requested that he helped found the Young Republicans on campus and become its vice president. All of these matters took place after he was released from prison, and within his probationary period.

The second area of untruthfulness concerns an answer given by Mr. Roots in response to a question on the Bar application about any aliases used by the applicant. Mr. Roots listed three aliases, Carl Davis, Rodgers Roop and Roger Bell, and stated on the application that they were used for purposes involving attending school, writing and telephone fundraising. However, in his testimony before the Committee, he revealed after questioning that the real reasons were quite different. The alias Carl Davis was used while Mr. Roots was evading the law after he was indicted for the weapons charge in Montana. Another alias, Roger Bell, was used by the Conrad Burns campaign to hide his true identity in making salary payments to him. Apparently, Mr. Roots falsely endorsed these paychecks and deposited them into his bank account. It is unclear if he ever paid income taxes on these amounts.

The third area, already mentioned above, is that Mr. Roots falsely stated on his gun applications that he was not a convicted felon.

I believe that Mr. Roots has shown a pattern of untruthfulness that is not consistent with practicing law.

*Ability to Take Oath in Good Conscience.* Of all the areas of concern, this is to me the gravest. Mr. Roots has shown by publications and articles he has written to be a committed racist, and has shown utter disdain for the fairness of the legal system and our system of government. These views were advanced not in the far distant past, but as recently as 1998, when he was well through law school. His views in this regard are summarized in two publications. The first is a pamphlet [Exhibit 5] that Mr. Roots apparently composed largely while he was in prison, and which was released no earlier than 1993, since the bibliography in the work lists references published in 1993. The title of the work is "100 Truths and One Lie" and is a manifesto proving the inferiority of blacks as compared with whites. Here are some samples from this enlightening work:

> "Fact # 6: Blacks are 6 times as likely to have I.Q.'s of 50 to 70 which put them in the slow learner (retarded) category, while Whites are ten times more likely to score 130 or over.

> Fact # 17: Among human races numerous studies have been made of the comparative weight of White and Negro brains with results that fell within the range of about an 8–12 percent lower weight for the Negro brain...

Fact # 19: The thickness of the supragranular layer (the outside layer) of the Negro brain is about 15 percent thinner, and its convolutions are fewer and more simple, on average, than that of the White brain.

Fact # 20: The frontal lobes of the Negro brain, responsible for abstract conceptional (sic) reasoning, are smaller relative to body weight, less fissured, and less complex than those of the White brain.

**\*1179** Fact # 24: The Negro skull, in addition to having a smaller brain volume and thicker cranial bones than that of the White, is prognathous; i.e. the lower face projects forward, rather in the manner of an animal's muzzle. In consequence, the Negro jaw is substantially longer, relative to its width, than the White jaw. A feature of the Negro lower jaw is its retention of a vestige of the "simian shelf", a bony region immediately behind the incisors. This simian shelf is a distinguishing characteristic of apes, and it is absent in Whites.

Fact # 46: Scientific research on what constitutes human beauty, in which 300 judges of various backgrounds were shown portrait photographs and asked to rate the beauty of the individual's face, has revealed that Nordic Whites are universally recognized as the most attractive humans, even by Blacks..." [All quotes from Exhibit 5]

The other publications are those Mr. Roots has written as a reporter for *The Jubilee.* This is an extreme right-wing publication, and Mr. Roots' articles have focused on racial matters and the trials involving the Montana Freemen. The Freemen believe that, as "organic white Americans" (as Mr. Roots calls them), they are not subject to the laws of the United States. They conduct their own trials and appeals in their own "common law" courts, and issue "liens" against the assets of public officials whom their "courts" believe trample on their rights. These include sheriffs, police officers, lawyers and judges. Mr. Roots apparently believes that these liens are legally valid. He states as follows:

> In commenting on the liens and notes (January 1997): "Ultimately, the notes are redeemable upon liens lawfully placed on the oaths or property of public officials who have violated the law. Thus the chain of recovery is lawful. It is where the buck stops that is so unsettling to the defacto regime that now occupies America. It is no wonder that the regime is now waging an around-the-clock war against the common law movement?(sic)" [See Exhibit 4].

Mr. Roots also apparently believes that the legal system is out to get the Freemen. Here are some samples of his statements

> In commenting on the trial of the Montana Freemen (January 1997): "With the prosecution of the Montana Freemen characters, the Zionist occupation government is again targeting what it perceives as the most serious threat to its power: law without lawyers and courts without legislative or executive sanction..." In that same article he refers to public defenders appointed by the Court as "public pretenders" and laments that "[e]ven during the 1996 stand-off at Justus, Montana, U.S. Attorney Matterucci was expressing hope that the men would all surrender and accept government-licensed lawyers. (Isn't it odd that U.S. prosecutors desire their opponents to be represented by bar attorneys?) Later, only those who accepted bar-lawyers were granted bail." [See Exhibit 9].

Again, these are not statements made many years ago; the above-referenced articles have been penned while he was attending Roger Williams Law School. I believe that these positions show disrespect and disregard for the legal system and for the many men and women who devote themselves to the practice of law and are inconsistent with the oath that all attorneys are required to take.

Mr. Roots now states that he is not a racist, and would have no problem serving persons of all races and backgrounds as an attorney. However, the Committee, I believe, has every right to examine all the facts and circumstances in order to evaluate the applicant's assertions. **\*1180** Given the facts of this case, I don't accept Mr. Roots' current assertions. I don't think he can in good conscience take the oath of an attorney to treat all members of the public and the legal system, such as judges, clients, and other attorneys with respect. His insulting, disdainful writings about judges, "bar association lawyers", "public pretenders" the "Zionist government" and the like can't be erased by merely stating

that all has changed. These writings were not from many years ago, in a misspent youth. They continued right up to at least 1998, and, based on Mr. Roots testimony, even up to today. They were not disclosed or mentioned anywhere; I located them personally on the Internet. I believe that these matters, when taken together with the criminal charges and the untruthfulness, should prevent Mr. Roots from becoming a member of the bar. I know that the majority of the Committee finds individual reasons for overlooking each of these matters taken individually, but I would urge the Court to look at the record in its entirety, and consider whether Mr. Roots is the kind of person that should be representing the Court and the Bar as an attorney. I do not believe that he is.

Respectfully submitted,

Steven M. McInnis

Chairman

April 19, 2000

**\*1181** Exhibit D



**All Citations**

762 A.2d 1161

# Footnotes

[1] We acknowledge that the Attorney General's replacement designee did not participate in the hearings preceding the initial November 1999 vote of the committee. Nevertheless, in our opinion, he was sufficiently apprised of the pertinent and largely undisputed facts concerning Roots's application to permit him to express his opinion on this matter. In any event, given the advisory character of his recommendation, we have received and considered it fully mindful of his lack of participation in the hearings and in the initial November 1999 vote of the committee.

[2] Moreover, it should be noted that Roots now blames his plea to this felony on his naiveté and on his public defender, stressing that he spoke to his appointed counsel only for a total of five minutes, and the attorney advised him to plead guilty because the word "struggle" appeared in a witness statement and that it was illegal to struggle with an officer.

[3] Roots's law school application accounts for this conviction by claiming that the Bureau of Alcohol, Tobacco, and Firearms "targeted" him "in an investigation into a homemade firearm I had used in a speech presentation. Several firearms were seized without warrant from my apartment in Powell, Wyoming. I ultimately pled guilty to the charge of 'Possession of an unregistered firearm.' "
Although Roots's self-serving statement regarding the authorities' lack of and alleged need for a warrant at the time of the weapons' seizure may have been correct, the fact remains that, when considering his moral character to be admitted to the bar in this state, warrant or no warrant, Roots possessed a cache of illegal firearms. Moreover, he did so after having been adjudged a felon when he failed to follow the terms of his second probation after his previous conviction for violently resisting his arrest.

[4] Roots also has not accounted for his 1986 Utah speeding and reckless driving violations. His bar application lists the disposition or fine for these speeding and reckless driving violations as "u/k," which we assume means "unknown." Although Roots has not forgotten about these violations, he has neglected to determine for over fourteen years whether any sanctions remain outstanding against him in Utah for these transgressions.

[1] As the federal court noted, the only injury in the fracas was to the officer's hand, the result of punching Roots in the face.

[2] Mr. Roots testified that he did not list his activities as Jubilee correspondent because it was an unpaid *ad hoc* function, not an ongoing job. As for his statement on his law school application that he left the Conrad Burns Campaign because of "school schedule conflict", while not mentioning the Campaign's concern over his extremist political beliefs, the Committee concludes this was not a deliberate prevarication. It appears to have been a stock response for the termination of most of his jobs; and if he wished to conceal his political activities he could have easily done so with a more accurate but equally unrevealing reason such as "policy differences".

[1] I thought the questions were appropriate, despite my concern about treading on any of his political beliefs, because they related directly to his understanding of our legal system and his potential conduct as an attorney.

[2] See e.g., Roger Roots, "Five Freemen Convicted One Acquitted in Federal Show Trial," *The Jubilee Newspaper,* Vol.10 No. 4, April 13, 1998, where it is stated by the author, "The "bank fraud" and "false claim" charges stemmed from documents issued from the common-law court of the Freemen Justices over an extended period. Such charges had occupied more than half of the two week trial. The jury, however, -even though selected and indoctrinated according to the de facto legal system-rejected this entire aspect of the case:" and Roger Roots, "How Strong Is The Case Against the Freemen?" *The Jubilee Newspaper,* Vol. 9, No. 3 1997 or 1998, where Mr. Roots wrote, "For once, a judge was asked to rule on the validity or invalidity of the Freemen financial instruments, all of which are backed

by judgments and liens. Ultimately, the notes are redeemable upon liens lawfully placed on the oaths or property of public officials who have violated the law. Thus the chain of recovery is lawful. It is where the buck stops that is so unsettling to the de facto regime that now occupies America. It is no wonder that the regime is now waging an around-the-clock war against the common-law movement?"

---

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.