**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| | **Case No. 1:23-cr-70 (CJN)** |
| **JESSE JAMES THE DEFENDANT,** | |
| **Defendant.** | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**RULE 29 AND 33 MOTIONS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Opposition to Defendant Jesse James Rumson's renewed motion for judgment of acquittal (originally stated orally at the close of the Government's case in chief) and motion for a new trial. ECF 79, 80. The Defendant asks this Court to set aside the Court's guilty verdict following the Defendant's bench trial and to enter a judgment of acquittal or, in the alternative, grant a new trial.

The Court convicted the Defendant of all counts in the Indictment (ECF 8):

- Count One, Civil Disorder, 18 U.S.C. § 231(a)(3);
- Count Two, Assaulting, Resisting or Impeding Corporal S.A., 18 U.S.C. § 111(a)(1);
- Count Three, Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1);
- Count Four, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2);
- Count Five, Engaging in Physical Violence in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(4);
- Count Six, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D);
- Count Seven, Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F); and
- Count Eight, Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).

The Court should deny the Motions because the Court correctly found that ample evidence existed to convict the Defendant of all counts beyond a reasonable doubt. In addition, the Defendant fails to raise sufficient grounds for a new trial.

## THE TRIAL EVIDENCE

The trial began on May 13, 2024 and concluded on May 24, 2024. The evidence at trial showed that the Defendant was aware of the constitutional significance of January 6 and that he was intent on disrupting Congress' certification of the 2020 election, including by using force against law enforcement. The trial evidence showed that the Defendant knowingly and intentionally ascended the northwest stairs shortly after seeing other rioters battling to push the outnumbered police line backwards up those stairs; he launched himself over the railing of the stairs leading to the Capitol's Parliamentarian Door; he entered that door just moments after watching another rioter smash through its windows and unlatch the door from the inside; he exited the Capitol thirteen minutes later through the same door, but this time in handcuffs; and, he twice attacked a police line attempting to clear rioters off the Upper West Terrace by, among other things, grabbing hold of and yanking back and downward the open face shield of a Prince George's County Police Department (PGPD) Officer. For this conduct, the Court properly convicted the Defendant on all counts.

### A.  The Defendant's January 6, 2021 Conduct

The trial evidence showed, and the Defendant admitted on the stand, that he attended the Stop the Steal Rally and heard the entirety of then-President Donald J. Trump's speech at the ellipse. During the speech, President Trump discussed the Electoral College Vote process and, specifically, Vice President Michael Pence's role in that process. *See* Exs. 201 & 202, at 5 ("And Mike Pence is going to have to come through for us, and if he doesn't, that will be a, a sad day for

our country because you're sworn to uphold our Constitution."), 12 ("They voted. But now they see all this stuff, it's all come to light. Doesn't happen that fast. And they want to recertify their votes. They want to recertify. But the only way that can happen is if Mike Pence agrees to send it back. Mike Pence has to agree to send it back." [Audience chants: "Send it back."]), 16 ("And Mike Pence, I hope you're going to stand up for the good of our Constitution and for the good of our country. And if you're not, I'm going to be very disappointed in you. I will tell you right now. I'm not hearing good stories.").



*Tr. Ex. 801: The Defendant, in his panda headpiece, is seen at very end of President Trump's speech, where the President says, "So we're going to, we're going to walk down Pennsylvania Avenue . . . And we're going to the Capitol . . .."*

Just after approximately 1:10 p.m., the Defendant marched with the crowd down Pennsylvania Avenue towards Capitol Grounds, which he admitted on the stand. *See id.* By approximately 2 p.m., the Defendant was among the thousands of rioters that had breached the Capitol's restricted perimeter, which was denoted by bike rack barricades with "AREA CLOSED" signs, among other things. *See, e.g.,* Tr. Exs. 113 (series), 114, 404, 404.1; 813 at 00:14 (where the Defendant stands near other male rioter holding "AREA CLOSED" sign on Upper West

Terrace). As shown throughout trial, the Defendant stood on the Lower West Terrace, near the northwest stairs and scaffolding. *See, e.g.,* Tr. Ex. 404, 404.1.



*Tr. Ex. 404: The Defendant's panda headpiece circled in yellow near scaffolding (timecode 10:00).*



*Tr. Ex. 404.1 (timecode: 2:07), 802 (zoomed & slowed version): Open-source video as one rioter enters stairs under scaffolding; as rioter turns to video behind him, rioter captures the Defendant in panda headpiece through scaffolding's white tarp.*

4

From that vantage point, the Defendant could see rioters battling the outnumbered USCP officers on the northwest stairs. *See id.* He could also see and hear the crowd that was encouraging the rioters to push the officers backwards, forcing them to retreat up the steps. *See, e.g.,* Trial Exs. 404, 404.1. Specifically, the Defendant could hear rioters shouting, "Come say hello to Michael Pence! Hello, Mr. Pence, do your fucking job!" *See* Tr. Ex. 404.1 at 00:46. He could also see and hear flashbangs and pepper spray being deployed nearby. *See id.* at 1:00 (videographer noting "so much damn tear gas"), 1:59 (flashbang audibly and visibly deployed), 2:07 (the Defendant visible in panda headpiece).

The Defendant then climbed the northwest stairs underneath the scaffolding. At approximately 2:25 p.m., still wearing the panda headpiece, The Defendant emerged from the scaffolding and rounded the corner to ascend to the Capitol's Upper West Terrace.



*Tr. Ex. 802: CCTV of Northwest stairs showing the Defendant emerging from scaffolding and climbing remainder of stairs towards Upper West Terrace.*

After reaching the Upper West Terrace, the Defendant made his way to the Northwest Courtyard to join the crowd that was accumulating by the Parliamentarian Door and the Senate Wing Door, which are perpendicular to one another. *See, e.g.,* Tr. Exs. 406-410. At the time, rioters were simultaneously attempting to breach both of those doors, and the Defendant positioned himself in the corner between the two doors. *See id.* Not only did his positioning allow him to

observe the rioters' progress in breaching both doors, but his positioning also allowed him to move quickly once the door was successfully breached. *See* Tr. Ex. 409 (00:02). Within seconds of one rioter successfully breaching the Parliamentarian Door, but before the rioter even entered the building, the Defendant bolted from his position in the corner, pulled down the panda headpiece, launched himself over the railings, and entered through the now-breached Parliamentarian Door. *See, e.g.,* Tr. Exs. 406-410.



*Tr. Ex. 406: Rioter smashing Parliamentarian Door with metal hooked cane (timecode: 00:01).*



*Tr. Ex. 409: Rioter who smashed Parliamentarian Door's window, indicated by red arrow, steps toward door while the Defendant, circled in yellow, pulls panda headpiece down over his face and bolts towards door (timecode: 00:03-00:04).*



*Tr. Ex. 408: The Defendant launches himself over staircase of railing (timecode: 00:20).*

The Defendant entered the U.S. Capitol building at 2:42 p.m. through the Parliamentarian Door. He was among the first 20 rioters to enter. *See* Tr. Ex. 803. The Defendant then proceeded down the hallway known as the Brumidi Corridor, where he joined the group of rioters that led a charge against the small line of USCP officers there. Those officers included USCP Officer R.P. At some point inside, the Defendant lost, abandoned, or otherwise removed the panda headpiece, but he continued wearing the backpack, as shown in Trial Exhibit 415, where officers responded to the rioters' advances by deploying pepper spray.



*Tr. Ex. 414: The Defendant, wearing panda headpiece and backpack, in Brumidi Corridor.*



*Tr. Ex. 415: The Defendant, outlined in yellow, without panda headpiece, but with backpack strap visible; USCP Officer R.P. is outlined in blue.*

As Officer R.P. testified, the rioters at the front of the mob were becoming violent towards the officers. *See* May 13, 2024 Trial Tr. (not yet available); [1] Tr. Ex. 416-18. Officer R.P. did not see what happened immediately after the above photo was taken, but, as a result of the altercation, the Defendant was placed in handcuffs. *See* May 13, 2024 Trial Tr. (not yet available); Tr. Ex. 314. The Defendant exited the Capitol building at 2:55 p.m. through the Parliamentarian Door without his backpack or the panda headpiece and remained in handcuffs affixed to his hands by police. *See id.* His face and hands were red and irritated, consistent with the effects of pepper spray. *See, e.g.,* Tr. Ex. 426. After he left the building, other rioters removed his handcuffs just outside the Parliamentarian Door, in the Northwest Courtyard.

---

[1] The government reserves the right to supplement this filing, if needed, once trial transcripts become available.



*Tr. Ex. 427: The Defendant celebrates as handcuffs are removed outside Parliamentarian Door on Upper West Terrace.*

The Defendant remained on the Upper West Terrace for around ninety minutes. During that time, among other things, he positioned himself near the Senate Wing Door (location E on the above 3D-rendering) and yelled, "Get a ram!!!" as rioters attempted to breach the windows adjacent to that door for a second time. *See* Tr. Ex. 315 (CCTV showing area from inside as rioters re-breach those windows around 3:52 p.m.). He helped encourage and celebrate rioters who had succeeded in breaching the windows. *See id.* at 00:33, 00:45. He also heckled officers inside the building through a nearby window yelling, "Join us, join or die!" at them, and encouraged the

crowd to begin a "Join us, join us" chant.







*Tr. Ex. 429 (top, timecode: 00:12): The Defendant, circled in yellow, yells, "GET A RAM!";*
*(middle, timecodes 00:33, 00:45): The Defendant claps when window is kicked in;*
*Tr. Ex. 431 (bottom, timecode 7:32): The Defendant, circled in yellow, starts "join us" chant.*

He also joined a "Trump won" chant around the same time. *See* Tr. Exs. 431 (approx. 05:35).

As all law enforcement witnesses testified, by approximately 4 p.m., reinforcements from nearby law enforcement agencies had arrived at the Capitol and gathered on the Upper West Terrace, including officers from MPD and PGPD. MPD Sergeant L.F. and other supervisory MPD officers quickly implemented a plan to form two officer lines, one that would move rioters northward, off the Upper West Terrace, and another that would move rioters westward, off the inaugural staging area. The police line planned to pushed rioters northward, around the corner of the building, and, eventually, off the Upper West Terrace. *See generally* Ex. 436. As the Upper West Terrace police line began moving north to clear the terrace, the rioters resisted.

At 4:12 p.m., as the police line was forming, the Defendant left the Senate Wing Door area, crossed in front of the police line, and positioned himself at the front of the rowdy mob facing off with the police line. *See, e.g., id.* Anticipating the police line's movement, rioters began fighting the officers in the line. *See* Tr. Ex. 813 (CCTV of NW Courtyard). The Defendant joined them, pushing against the police line for approximately 50 seconds (and conceded on the stand that during that time, at least 13 other rioters went the other direction, exiting the scene, unlike him).





*Tr. Ex. 810 (timecode: 00:00 (top), 00:35 (bottom)): The Defendant, circled in yellow, moves to front of mob of rioters and begins physically pushing back against police line.*

As the rioters clashed with the police line, the Defendant was momentarily pushed backwards. Undeterred, however, he charged back at the line, where he reached up with his right hand and grasped the face shield of PGPD Corporal S.A.



*Tr. Ex. 435: The Defendant grabs Corporal S.A.'s face shield with his right hand.*

12

The Defendant yanked Corporal S.A.'s face shield, whipping Corporal S.A.'s head back and downward, which forced Corporal S.A. to keel over in pain. *See* Tr. Exs. 810, 811, 814 (open-source and BWC assault videos). The body-worn cameras of several MPD officers near Corporal S.A. capture the Defendant approaching the police line at 4:22:31 p.m. and walking away at 4:22:48 p.m. after assaulting Corporal S.A. *See, e.g.,* Tr. Ex. 814.



*See Tr. Ex. 812 ((BWC), timecode 0:44):*
*The Defendant, outlined in yellow, approaches the police line at 4:22:31 p.m.*



*Tr. Ex. 502 ((BWC), timecode 1:02):*
*The Defendant, circled in yellow, walks away from police line post-assault, as other rioters fall to the ground in front of him at 4:22:48 p.m.*

After continued battling with rioters, the police line was able to eventually force rioters on the Upper West Terrace northward. The police line then moved the rioters around the corner of the Capitol building, and onto the North Terrace. Eventually, the rioters were forced off the North Terrace, too. After leaving the North Terrace, the Defendant crossed back over the north lawn area and headed back towards the Capitol's west front.



*Tr. Ex. 439 (timecode: 00:22): The Defendant, circled in yellow, crosses the north lawn towards west front.*

### B. Defendant's Admissions

Not only did the Defendant admit on the stand that he heard President Trump's speech in full at the Ellipse on January 6, 2021, but he also admitted the same in multiple public speeches and interviews prior to trial. *See* May 13, 2024 Trial Tr. (not yet available); Tr. Ex. 440, 441, 444. Moreover, when explicitly asked by the Court, the defendant conceded that, prior to and on January 6, he knew Vice President Michael Pence *would be* visiting the Capitol at some point on that day.

The Defendant also confirmed at trial that he was the individual in the panda headpiece on January 6, 2021, that he went inside the Capitol building, and that he left in handcuffs. *See id.* Notably, although the Defendant testified that the events of January 6 and the fighting with the

police line around 4:22 p.m., in particular, saddened him, he admitted to obtaining a second panda headpiece, which he displayed like a trophy during many of his public interviews and speeches. *See id.*



*Tr. Ex. 444 (timecode: 33:49): The Defendant giving online interview with panda headpiece on couch behind him.*

He also admitted under oath and in interviews that at the time he was detained and placed in handcuffs inside the Capitol building, he knew he was illegally trespassing: "I thought they [the police] were going to pull me behind the line, handcuff me, and tell me to sit down, while they got the rest of the situation under control . . . [I thought the police would] maybe be like, 'you know, this is an unlawful, you know, you guys are trespassing, you know, we need you guys to exit the property.'" *See* Tr. Ex. 444 (approx. 20:00 – 20:18). "I expected to be handcuffed and sat down, and that way they could be like, 'get him for trespass' . . . I was expecting to be detained." *Id.* (approx. 20:18 – 20:31).

In addition, the Defendant admitted on the stand and in interviews to making physical contact with PGPD Corporal S.A., as is charged in Count Two. May 13, 2024 Trial Tr. (not yet available). In the Defendant's September 2023 speech in Citrus County, Florida, he explained the assault as follows: "That day, I was pushed up against a police line, and they nailed me in the ribs

with a baton, and as my hand went up, it brushed the officer's helmet for a hundredth of a second, and they claim that that is enough to put in jail under federal assault charges. I don't know about you guys, but I'd say an incidental reflex action is not worth dozens of years in prison." *See* Tr. Ex. 440 (approx. 8:00 – 8:20). He also admitted on the stand that as time wore on and he did more interviews, his story became more dramatic, including claiming his ribbed was not just hit but, instead, "cracked," for example.

The Defendant further admitted at trial and in various speeches and interviews that his illegal entry onto Capitol Grounds and into the Capitol on January 6, 2021 was not his first time at the U.S. Capitol Building, and that he considered the Capitol Building to be "one of the most secure buildings in the world, this is [where] one third of the U.S. government" sits. *See* May 13, 2024 Trial Tr. (not yet available); Tr. Ex. 444 (approx. 11:00). On the stand and in interviews, he confirmed his understanding of both the normal required security measures to enter the building and the typical process of the Electoral College Vote Certification: "I know they just installed the, uh, uh metal detectors on the inside, there's probably a little security perimeter, they're probably gonna' invite you in, give you a little frisk pat down, walk through the metal detector . . . and then you get to . . . stand on the upper level" of the Senate or House chamber, and "get to look down on the people as they vote . . . I'm sure they'd tell you to, you know, tell you to 'be quiet' or whatever during the votes, but I was definitely – wanted to be one of the first people in line to get in that room – I know there's probably a capacity[.]" *See, e.g.,* May 13, 2024 Trial Tr. (not yet available); Tr. Ex. 444 (approx. 11:00-12:13).

The Defendant also admitted under oath and in various speeches and interviews that, around January 6, he was closely following global politics and, domestically, the Supreme Court cases involving election fraud. For example, he admitted that he wore a "heaven will destroy the

CCP Hong Kong protest shirt" and the panda headpiece to January 6 because, at the time, he hoped to spread awareness of what was going on in China; specifically, he said he went to D.C. in that outfit because he wanted to get others "more viscerally engaged in what's going on in the global, global situation. So, between the Hong Kong and the *Texas v. Pennsylvania* lawsuit, Trump had said come on up, all the Patriots . . .." *See, e.g., id.* (approx. 8:00 – 8:43).

Finally, when asked by the Court for the Defendant's explanation regarding his choice to attack the police line and, specifically, to attack Corporal S.A., the Defendant responded that, at the time, he felt "hope and confusion." *See* May 13, 2024 Trial Tr. (not yet available);

## ARGUMENT

Defendant's filings are plainly deficient under Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure. His Motions thus should be denied.

## I.   Applicable Law.

### A.   Rule 29.

"District courts generally have the power to reconsider non-final rulings. As the Supreme Court put it long ago, '[j]urisdiction to correct what had been wrongfully done must remain with the court so long as the parties and the case are properly before it.'" *United States v. DaSilva*, No. 1:21-CR-00564 (CJN), 2024 WL 519909, at *2–4 (D.D.C. Feb. 8, 2024) (citing *Nw. Fuel Co. v. Brock*, 139 U.S. 216, 219 (1891)). "Thus, '[i]nterlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment.'" *Id.* (citing *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997)). The "long ... settled basic power of a trial court to reconsider its interlocutory rulings exists in criminal cases as well as civil cases . . . This authority logically extends to findings of guilt in bench trials." *See id.* (internal citations and

quotations omitted). "The closest potential analogue [to a rule codifying this inherent power] is Rule 29, which governs motions for a judgment of acquittal." *See id.*

Assuming, as this Court noted during trial, that Rule 29 applies to bench trials, Rule 29 of the Federal Rules of Criminal Procedure permits the defendant to move for judgment of acquittal at the close of the government's case in chief or at the close of all evidence on the grounds that the evidence presented is "insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A court can grant such a motion only if the evidence, considered 'in the light most favorable to the government,' is not 'sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt.'" *DaSilva*, 2024 WL 519909 at *4 (citing *United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001) (citations omitted)); *see also, e.g., United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002)).

A defendant's Rule 29 burden at the post-verdict stage is "very high," in part because evidence to support a conviction does "not need to be overwhelming." *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015).

    B.  Rule 33.

Federal Rule of Criminal Procedure Rule 33 allows courts, at a defendant's request, to vacate a judgment and order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Motions under Rule 33 are disfavored, however, and 'viewed with great caution.'" *E.g., United States v. Hale-Cusanelli,* No. 1:21-CR-00037 (TNM), 2022 WL 4300000, at *3 (D.D.C. Sept. 19, 2022) (citing *United States v. Borda*, 786 F. Supp. 2d 25, 31 (D.D.C. 2011) (cleaned up)). "Courts 'sparingly' exercise their authority to order a new trial, reserving it for 'extraordinary circumstances where the evidence preponderates heavily against the verdict' and when any error 'affects a defendant's substantial rights.'" *Id.* at 32 (cleaned up) (citation omitted). "Granting a new

trial 'is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred.'" *Reffitt,* 602 F. Supp. 3d at 90 (citing *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation marks and citation omitted)). Indeed, application of the rule "should be … limited to situations presenting a serious danger that . . . an innocent person has been convicted." *Borda*, 786 F. Supp. 2d at 32 (D.D.C. 2011) (internal quotations and citations omitted). The defendant bears the burden of "proving that the new trial is justified." *Reffitt,* 602 F. Supp. 3d 90 (citing *United States v. Mangieri,* 694 F.2d 1270, 1285 (D.C. Cir. 1982).

**II.     The Defendant's Rule 29 Motion Must Be Denied.**

    A.  Sections 111(a) and 1114 Do Not Require the Government to Identify Which "Specific Federal Officer" was Assisted.

The Defendant's first Rule 29 argument is that the government failed to prove that the Defendant's assault victim, PGPD Corporal S.A., met the Court's definition of "law enforcement officer" under Section 111(a). *See* ECF 79 at 1. He argues that "[b]ecause the evidence in the case did not show that Corporal [S.A.] was officially assisting a *specific officer* as outlined in that section of the law, this Court must acquit." *See id.* (emphasis in original). This position is an inaccurate statement of law, and one that courts in this District have previously rejected.

Here, the Court's bench instructions tracked the statute, which defines a "law enforcement officer" under Section 111(a) to include "a person assisting an officer or employee of the United States or of any agency in any branch of the United States Government in the performance of official duties." ECF 78 at 3. The bench instructions further stated that, "[t]he term 'law enforcement officer' carries the meaning it has in 18 U.S.C. § 1114[.], including a person assisting an officer or employee of the United States or of any agency in any branch of the United States Government in the performance of official duties." *Id.* Following trial, the Court found that the government readily proved that PGPD Corporal S.A. was one person among the many "person[s]

assisting" the U.S. Capitol Police on January 6, 2021. *See* May 24, 2024 Verdict Tr. (not yet available).

In his Motion, the defendant attempts to add—and provides no legal basis for—a new element to the statute, namely, that the government must have identified what "specific [federal] officer" Corporal S.A. was assisting. *See* ECF 79 at 1. Not only did the Defendant did not propose this requirement in his proposed bench instructions (ECF 72), but he also did not request its inclusion in the Court's final bench instructions, instructions to which he did not object. *See* May 13-14, 2024 Trial Tr. (not yet available). Initially, therefore, the Defendant's argument was waived.[2]

Moreover, the government is not aware of a single court nationwide that has interpreted Sections 111(a) or 1114 in the manner the Defendant suggests, be it in this district in the context of January 6 or otherwise. *See, e.g., United States v. Smith*, 296 F.3d 344, 346-47 (5th Cir. 2002) (upholding a Section 1114 jury conviction where the state agents did not know the specific FBI officers involved: The FBI agent "heard a radio report that the Dallas police were chasing [ ] suspected robbers, and he and his partner joined in the pursuit. At this point, a federal investigation was clearly underway; and by pursuing the bank robbery suspects, the Dallas police were assisting the FBI."); *United States v. Hooker*, 997 F.2d 67, 74 (5th Cir. 1993) (rejecting defendants'

---

[2] *See* Fed. R. Crim. Pro. 30(d); *see also, e.g., Hobson v. Wilson*, 737 F.2d 1, 31 (D.C. Cir. 1984) ("Whatever objection might have been raised, we find that [the moving party] did not raise this argument after the instruction was given and, consequently, it has waived any right to pursue this matter on appeal.") (overruled in part on other grounds by *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)); *United States v. Gan*, 54 F.4th 467, 478 (7th Cir. 2022) ("a failure to object under Rule 30(d)" limits subsequent review "to plain-error review under Rule 52(b)"); *United States v. Perez-Rodriguez*, 13 F.4th 1, 16 (1st Cir. 2021) (if a defendant "fails to preserve his claim of entitlement to a jury instruction, the claim is forfeited, and we review the district court's decision under the plain error standard of Rule 52(b)").

argument that the Mississippi Bureau of Narcotics officer they assaulted was not a federal officer under Sections 111(a) and 1114, where that officer was conducting a sting operation in conjunction with the DEA and was not assisting one specific federal officer at all, but was instead part of a federal and state team that was attempting to execute the sting operation, including through audio surveillance); *United States v. Makwa*, 2016 WL 11486901, at *3 (D. Minn. Mar. 23, 2016), *report and recommendation adopted*, No. 16-06 (MJD/FLN), 2016 WL 2853512 (D. Minn. May 16, 2016) (upholding Section 111(a) conviction where FBI agent contacted County police dispatcher "to request assistance" in a car chase of the defendant, and the dispatcher informed the agent the County had "dispatched officers to respond," including one County Deputy and "a Minnesota State Trooper[.]").

The most obvious explanation for the dearth of case law on this issue is that the drafters of Section 111(a) and 1114 did not intend to require emergency responders assisting federal officers to have to pause their emergency response midway to accommodate a session of formal introductions between the specific federal officer requiring assistance and the individual responding to assist.

Indeed, judges in this court have recognized as much when ruling on this and similar arguments in the context of January 6 prosecutions. For example, in *United States v. Todd*, 22-cr-166 (BAH), the defendant made similar arguments to the one this Defendant makes in his Rule 29 motion. There, the defendant relied on a Third Circuit case, *United States v. Washington,* 79 F.4th 320 (3rd Cir. 2023), in contending that "the government ha[d] not met its burden of showing that Metro PD officers in this case were properly assisting federal officers." *Todd*, 22-cr-166 (BAH), Feb. 2, 2024 Trial Tr. at 259:13-14. The defendant argued that an entirely different statute, 2 U.S.C. § 1961 required the "Capitol Police Board" to have sought assistance officially, expressly, and in

writing from the Metropolitan Police Department (MPD). *See id.* at 259-60. At the charging

conference, Judge Howell disagreed:

> [Y]ou are not questioning that U.S. Capitol Police was under -- was a qualified person under 114. You are questioning whether MPD had authority to be assisting.
>
> Without first impression, when you look at 114, it covers people who were an officer or employee of the United States or any agency in any branch of the U.S. government; also, an officer or employees engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties.
>
> **So "any person" could be MPD. It could have been, actually, any protester on the day of January 6, 2021, who came to the aid of the U.S. Capitol Police instead of resisting orders by the U.S. Capitol Police; that person, too, could have been assisting the U.S. Capitol Police. It has no special requirement in Section 114 that you are trying to import into it with this novel argument, [opposing counsel], that that person assisting had to have been working under some other lawful authority that is fully certified with every "T" crossed and "I" dotted.**
>
> . . .
>
> So that argument, to the extent you are trying to make it in a Rule 29 motion or for purposes of the jury instructions, is rejected.

*Id.*, Trial Tr. at 261:16-263:1 (bolding added).

About two months later in *United States v. Copeland*, 23-cr-224 (DLF), the Defendant's

counsel here made the same arguments before Judge Friedrich. In his pretrial memorandum in

*Copeland*, the defendant attempted to add an element to the Section 111(a) instructions as follows:

"If the defendant's alleged forcible or violent act consisted of assaulting, resisting, opposing,

impeding, intimidating, or interfering with an MPD officer, that officer must have been assisting a

specific USCP officer directly[.]" 23-cr-224 (DLF), ECF 79 at 14. Judge Friedrich rejected that

argument. *See id.*, ECF 95 (Final Criminal Elements) (rejecting requested additional element that

government identify what specific federal officer was assisted).

This Court should do the same today, as the Defendant's legal argument lacks muster and has failed to meet the high burden set forth in Rule 29. *Pasha*, 797 F.3d at 1135 n.9.

B.   The Defendant's Theory of Factual Overlap as it Relates to Counts 1 and 2 Misstates the Law.

Next, the Defendant argues—again without any legal support and again without preserving any of these issues before the close of trial—that the "Court must acquit Defendant of both Counts 1 and 2, because the Count 2 assault charge was used to fulfill the element of Count 1, 18 U.S.C. § 231(a)(3) Civil disorders." ECF 79 at 1. This is incorrect.

First, the Defendant misstates the Court's findings underlying its verdict. In its verdict, the Court made clear that the Defendant obstructed, impeded, and interfered with Corporal S.A. by, *twice*, engaging with the line of officers of which Corporal S.A. was a part. *See* May 24, 2024 Verdict Tr. (not yet available). As noted above, the Defendant first joined a group of rioters fighting the moving line of police officers on the Upper West Terrace as those officers were attempting to clear rioters northward and off the terrace. *See* Tr. Ex. 810, 813. The Defendant joined in by pushing against that line, of which Corporal S.A. was a part, for approximately 50 seconds (while, as seen in various video exhibits, at least 13 other rioters went the other direction, exiting the area). *See* May 14, 2024 Trial Tr.; Tr. Ex. 810, 813. Then, the Defendant was momentarily pushed backwards, but, undeterred, he charged back at the line a second time, where he reached up with his right hand, grasped the face shield of PGPD Corporal S.A., and yanked it back and down, thus obstructing, impeding, and interfering with PGPD Corporal S.A. for a second time. *See* Tr. Exs. 810, 811, 814. For this very reason, the Court specifically asked the Defendant at the end of his cross-examination whether he had any credible explanation for his choice to attack the police line for a *second* time. He did not. *See* May 13-14, 2024 Trial Tr. (not yet available).

Thus, the underlying premise that Count 1 was predicated on the exact overlap of evidence that also convicted the Defendant of Count 2 is flawed.

Even assuming, *arguendo*, the Court relied on identical facts to support both the Defendant's Section 111(a) and Section 231(a)(3) convictions, doing so is perfectly permissible, given that the intent to violate Section 231(a)(3) can represent a predicate offense for the purposes of Section 111(a), and both crimes have distinct and separate intent requirements. *See United States v. Harris*, 21-cr-00189 (CJN), May 31, 2023 Minute Order (denying an identical to this one argument in that defendant's motion to dismiss, ECF 49). Although two crimes may share an *actus reus*, the *mens rea* is different. A defendant can commit an assault, or other verb-based violation of Section 111, with the separate intent to interfere with officers during a civil disorder. Indeed, an offense under Section 111(a)(1) only requires proof that the defendant intentionally assaulted, resisted, opposed, impeded, intimidated, or interfered with a federal officer engaged in his or her official duties. The statute is thus broad: a defendant can violate Section 111(a)(1) by striking any federal officer, in any situation, for any purpose, as long as he does so with the requisite *mens rea*, as delineated in 18 U.S.C. 111(a) (enhancing the crime based on a present "intent to commit another felony").

By contrast, the civil disorder offense requires proof that the defendant "commit[ted] or attempt[ted] to commit any act to obstruct, impede, or interfere with any . . . law enforcement officer lawfully engaged in lawful performance of his official duties incident to and during the commission of a civil disorder . . . ." 18 U.S.C. § 231(a)(3). In other words, the civil disorder offense requires not just the commission of an act, but that the defendant committed the act with the specific intent "*to* obstruct, impede, or interfere with" a law enforcement officer. *Id.* (emphasis added).

As this Court knows, Section 111 elevates assaults to felonies when the underlying assault is committed with felonious intent. By that same token, section 231 requires a different set of facts – the existence of a civil disorder – coupled with a specific intent to interfere. While crimes may have overlapping conduct, intent, or even the purpose behind criminalizing such behavior in the first place, this is not uncommon in the criminal justice system. For example, although both involuntary manslaughter and premeditated murder are unlawful homicides resulting in the loss of a human life, premeditated murder involves the intent to kill while involuntary manslaughter does not. Accordingly, federal criminal law and the law of every state punishes premediated murder more harshly than involuntary manslaughter; not because the defendant's conduct resulted in someone's death, but because of the defendant's intent to cause that result. *Compare* 18 U.S.C. § 1111(b) (mandatory penalty for first degree murder is death or imprisonment for life) with 18 U.S.C. § 1112(b) (maximum prison sentence for involuntary manslaughter is 8 years). Here, section 111(a)'s "intent to commit another felony" language reflects the same judgment that intent matters.

At its core, the Defendant's argument is premised upon the misunderstood concept of Double Jeopardy, and whether a single act may constitute an offense of two different statutory provisions. As this Court knows, the Double Jeopardy Clause "protects against multiple punishments for the same offense." *United States v. Crosby*, 20 F.3d 480, 483 (D.C. Cir. 1994) (citations omitted).  "To claim benefit of the guarantee, 'a defendant must show that the two offenses charged are *in law and fact* the same offense.'" *Id.* (emphasis added) (citing *United States v. Benefield*, 874 F.2d 1503, 1505 (11th Cir. 1989)). Here, the Defendant has devoted all of one sentence to analyze the overlap between Sections 111 and 231, when – as discussed above – both crimes have distinct elements. Since both crimes require "proof of a fact which the other does not",

*Blockburger v. United States*, 284 U.S. 299, 304 (1932), the crimes were permissibly charged. Thus, the Defendant was duly convicted.

**III.    The Defendant's Rule 33 Motion Also Must Be Denied.**

In his Rule 33 Motion, the Defendant—without any factual or legal analysis—boldly asserts that the Court must overturn its own findings of fact and conclusions of law due to insufficiency of the evidence. Specifically, he demands a new trial based on a dispute of whether the Defendant was or was not on the scaffolding. According to the Defendant, the Court found that the Defendant "was present" on the scaffolding, whereas the "clear and undeniable testimonial evidence" of witnesses indicated that the Defendant "was not" on the scaffolding. *See* ECF 80 at 1. The Defendant does not even attempt to argue why this evidence impacted the verdict such "it would be a miscarriage of justice to let the verdict stand." *Id.* (citing *United States v. Walker*, 899 F. Supp. 14, 15 (D.D.C. 1995) (quoting *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985))). Thus, the government is left guessing as to how this single fact upended the elements of the crime that the government was required to prove – and did prove – beyond a reasonable doubt.

Once again, the Defendant's claim is premised on a misinterpretation of the Court's verdict in the first place. According to the Defendant, "while delivering its findings of fact, [the Court] stated that Defendant's approach and presence on and around the scaffolding directly informed its finding of a guilty mens rea for all counts at the time of the incident." *See* ECF 80 at 1-2. But the opposite is true. Instead, the Court repeatedly stated throughout trial that it did not find the Defendant's route up to the Upper West Terrace to be particularly relevant or crucial to assessing the elements of each crime. *See* May 13-14, 2024 Trial Tr. (not yet available). Although his chosen path up the scaffolding and northwest stairs demonstrated that the Defendant was undeterred by on-going violence and understood that the Vice President was visiting the Capitol, given other

rioters were loudly shouting about that particular fact (*see* Tr. Ex. 404.1 at 00:46 (rioter on megaphone yelling, "Come say hello to Michael Pence! Hello, Mr. Pence, do your fucking job!")), this evidence became even less important when the Defendant admitted on cross-examination and in response to the Court's questioning that he did, in fact, know that Vice President Michael Pence *would be* visiting the Capitol at some point on January 6, 2021. *Id.* Thus, evidence surrounding whether the Defendant was or was not "on the scaffolding" does not meet even the Defendant's cited legal standard: it does not "'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" ECF 80 at 1 (citing *Walker*, 899 F. Supp. at 15).

The Defendant also claims that "all Capitol Police Officers who testified in the case" (Inspector N.M. and Officer R.P.) and the key government witnesses at the scene (likely MPD Sargent L.F. and the assault victim in the case, Corporal S.A.) provided "clear and undeniable testimonial evidence" on this issue. ECF 80 at 1. But only one of those witness – Inspector N.M. – was ever asked, on cross-examination, about the Defendant's route to the Upper West Terrace. When asked whether she observed an individual wearing a panda *hood* as opposed to a panda *headpiece* in the Trial Exhibit 803 (CCTV of the northwest stairs), Inspector N.M. indicated it was *possible* the individual on the northwest stairs was wearing a panda hood, not a headpiece. *See* May 13, 2024 Trial. Tr. (not yet available). Thus, the testimony from this sole witness was far from clear and undeniable. In other words, this dispute is illusory in nature.

Similarly, because the Court found that the Defendant did, indeed, travel under the scaffolding and up the northwest stairs to the Upper West Terrace, the Court rejected the Defendant's attempt to show that Trial Exhibit 803 (CCTV of the northwest stairs), did *not* depict the Defendant climbing those stairs. *See* May 13-14, 2024 Trial Tr.; May 24, 2024 Verdict Tr. (both not yet available). His statement that "none of the CCTV camera footage in evidence in this

case depicts the Defendant's approach and presence on and around the scaffolding" is simply incorrect. *See* ECF 80 at 2. All in all, the Defendant has not identified any reason, let alone a significant one, why the Court's findings as to the scaffolding has any bearing on the verdict.

He therefore fails to show how the Court's verdict – or any alleged errors related to the factual findings – constituted "extraordinary circumstances" "presenting a serious danger that . . . an innocent person has been convicted." *E.g., Hale-Cusanelli,* 2022 WL 4300000, at *3 (citations omitted); *Borda*, 786 F. Supp. 2d at 31-32. For this reason, it should be denied.

## **CONCLUSION**

For the reasons discussed herein, The Defendant's Rule 29 and 33 Motions should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

*/s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D. Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov