# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-70 (CJN)** |
| **JESSE JAMES RUMSON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jesse James Rumson to 66 months of incarceration, thirty-six months of supervised release, $2,000 restitution, and a special assessment of $285. A 66-month term of incarceration, which is at the high end of Rumson's guidelines range of 57-71 months, reflects the seriousness of his violent conduct during the riot at the United States Capitol, and his efforts to obstruct this case by both lying to the FBI and perjuring himself repeatedly during his trial testimony.

## I.    INTRODUCTION

Rumson a former comic bookstore manager, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

1

On January 6, Rumson ascended to the Upper West Terrace of the Capitol building via the Northwest Steps, climbing through scaffolding into the midst of a riot while wearing a large panda headpiece. Once on the Upper West Terrace, Rumson spent approximately thirty minutes trying to find an opening to enter the building. At 2:44 p.m., he saw his chance when another rioter smashed through the Parliamentarian Door. Rumson raced to the door and hurdled over a railing to become one of the first rioters to breach that location. After an altercation with police inside the building, officers arrested and handcuffed Rumson. They then searched his person and his backpack. Approximately five minutes later, another rioter escorted Rumson out of the building on to the Upper West Terrace where yet another rioter used a key to uncuff him. Rumson then remained on the Terrace for another ninety minutes. During that period, he called out to other rioters to "get a ram" to breach the Senate Wing Door and shouted taunts and harassment at police officers inside of the building. At 4:22 p.m., as a line of police officers were beginning to clear the Upper West Terrace, Rumson repeatedly charged at the police line for approximately fifty seconds. During his final charge, he grabbed the face shield of a police officer, Corporal S.A., yanked it downward, then retreated into the mob. As a result of Rumson's assault, the officer experienced pain to his neck.

Following his arrest in this case in February 2023, Rumson sat for a series of media interviews in which he simultaneously boasted about his participation in the events of January 6

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

and minimized his conduct. Rumson also ran for local political office in Florida, trumpeting his status as a January 6 defendant. At his trial, Rumson took the stand and perjured himself.

The government recommends that the Court sentence Rumson to 66 months of incarceration for his convictions on, *inter alia*, 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 111(a)(1). A 66-month sentence reflects the gravity of Rumson's conduct and takes into consideration his repeated efforts to obstruct this case by lying about his conduct to the FBI and under oath at trial.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 1-1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.     Rumson's Role in the January 6, 2021, Attack on the Capitol

Rumson travelled to Washington, D.C. from his home in Lecanto, Florida, to attend the former President's "Stop the Steal" rally, which was held on the Ellipse and on the National Mall on January 6, 2021. Rumson attended and heard the entirety of the former President's speech. While at the rally, Rumson was wearing a large panda headpiece, a jacket with a distinctive stripe on the sleeve, a black tee shirt reading "heaven will destroy the CCP" with a large Chinese character, camouflage pants, and wooden prayer beads. Rumson was also carrying a backpack stuffed with metal ballistic plates and a black and white flag of the Culpeper Minutemen.[2]

---

[2] This flag was used by a militia from Virginia in the lead up to the Revolutionary War. The flag reads, "The Culpeper Minute Men. Liberty or Death. Don't Tread on Me." It also has an image of a coiled snake.



*Gov. Ex. 801: Rumson,[3] in his panda headpiece.*

At approximately 1:10 p.m., Rumson marched with the crowd down Pennsylvania Avenue towards the Capitol Grounds. *See id.* By approximately 2:00 p.m., Rumson was among the thousands of rioters who had breached the Capitol's restricted perimeter, which demarcated by bike rack barricades bearing "AREA CLOSED" signs. *See, e.g.,* Gov. Ex. 113 (series), 114, 404, 404.1; 813 at 00:14 (Rumson stands near another male rioter holding "AREA CLOSED" sign). Rumson stood on the Lower West Terrace, near the northwest stairs and scaffolding. *See, e.g.,* Gov. Ex. 404, 404.1.

---

[3] In the photographs throughout this memorandum, Rumson is identified with yellow arrows, circles, or boxes.

4



*Gov. Ex. 404 at 10:00: Rumson's panda headpiece circled in yellow near scaffolding.*



*Gov. Ex. 404.1 (left) at 2:07, 802 (right): Rumson, in panda headpiece, seen through a translucent tarp approaching the Northwest Steps.*

From that vantage point, Rumson could see other rioters battling the vastly outnumbered United States Capitol Police (USCP) officers on the northwest stairs. *See id.* He could also see and hear members of the mob who were encouraging their fellow rioters to push the officers backwards, forcing them to retreat up the steps. *See, e.g.,* Gov Ex. 404, 404.1. As he made his approach, Rumson also would have heard other rioters on the Northwest Steps yelling invectives that were directed as Vice President Pence. *See* Gov. Ex. 404.1 at 00:46. He also would have been able to see and hear police deploy crowd control measures. *See id.* at 1:00 (videographer noting "so much damn tear gas"), 1:59 (flashbang deployed), 2:07 (Rumson in panda headpiece).

5

Rumson then climbed the northwest stairs underneath the scaffolding. At approximately 2:25 p.m., still wearing the panda headpiece, Rumson emerged from the scaffolding and rounded the corner to ascend to the Capitol's Upper West Terrace.



*Gov. Ex. 802: Rumson emerging from scaffolding and climbing the remainder of the Northwest Steps towards Upper West Terrace.*

After reaching the Upper West Terrace, Rumson made his way to the Northwest Courtyard to join the crowd massing near the Parliamentarian Door and the Senate Wing Door, which are perpendicular to one another within that courtyard. *See, e.g.,* Gov. Ex. 406-410. At the time, rioters were simultaneously attempting to breach both of those doors, and Rumson positioned himself in the corner between the two doors. *See id.* From his position near the Senate Wing Door, Rumson was able to see another rioter smash through the nearby Parliamentarian Door with a metal cane. Within seconds of that rioter breaching the Parliamentarian Door, Rumson bolted from his position in the corner, launched himself over the railings and onto the stairwell leading into the Capitol, and entered through that door. *See, e.g.,* Gov. Ex. 406-410.



*Gov. Ex. 408 at 00:20: Rumson launches himself over a railing.*

Rumson entered the Capitol at 2:42 p.m. through the Parliamentarian Door. He was among the first twenty rioters to enter through that door. *See* Gov. Ex. 803. Rumson walked down a hallway known as the Brumidi Corridor, where he joined a group of rioters who led a charge into the building. There, they faced off against a small line of USCP officers, including USCP Officer R.P. At some point inside, Rumson lost or abandoned the panda headpiece, but he continued wearing the backpack, as shown in Gov. Ex. 415.   Officers responded to the rioters' advances by deploying pepper spray. Trial Tr., May 13, 2024, at 135:9-24.



*Gov. Ex. 414: Rumson, wearing panda headpiece and backpack, in Brumidi Corridor.*



*Gov. Ex. 415: Rumson, without the panda headpiece, but with the backpack strap visible; USCP Officer R.P. is outlined in blue.*

Rumson was at the front of this mob as they tried to advance further into the building and

7

bypass the USCP officers, including Officer R.P., who were standing in their way. *See* Gov. Ex. 411-20.   Regarding the rioters in this area, Officer R.P. stated that "some of [the rioters] were starting to act in a very aggressive manner, as if they were trying to start coming towards outline to try to break through our line." Trial Tr., May 13, 2024, at 135:12-15. Officer Parker further testified that, as a result of the rioters' conduct, Officer had to use pepper spray to try to keep them from breaking through the police line. *Id.* Although there were many rioters in this crowd in the Brumidi Corridor at this time and officers had to use chemical agents to deter many rioters from advancing further in the building, only one rioter's conduct led to him being separated from the crowd, placed into handcuffs, searched, and detained for approximately five minutes: Rumson. At 2:55 p.m., other rioters escorted Rumson, still handcuffed but without his backpack or the headpiece, out of the Capitol building through the Parliamentarian Door without. *See* Gov Ex. 314 at 0:00-0:09. His face and hands were red and irritated, consistent with the effects of pepper spray. *See, e.g.,* Gov. Ex. 426; *see also* Trial Tr., May 13, 2024, at 250:2-10. After Rumson left the building, another rioter used a handcuff remove his handcuffs just outside the Parliamentarian Door in the Northwest Courtyard.



*Gov. Ex. 427: Rumson celebrates outside the*
*Parliamentarian Door as the handcuffs are removed.*

Rumson remained on the Upper West Terrace for approximately ninety minutes. During that time, he positioned himself near the Senate Wing Door and yelled, "Get a ram!" as rioters attempted to breach the windows adjacent to that door for a second time. *See* Gov. Ex. 315. He helped encourage and celebrate rioters who had breached the windows. *See id.* at 00:33-00:45. He also heckled officers inside the building through a nearby window, yelling, "Join us, join or die!" When the officers refused to acknowledge his exhortations, Rumson encouraged the crowd to begin a "Join us, join us" chant.



*Gov. Ex. 429 at 00:12: Rumson, yells, "Get a ram!"*

By approximately 4:00 p.m., reinforcements from nearby law enforcement agencies had arrived at the Capitol and gathered on the Upper West Terrace to reinforce the USCP officers, including officers from MPD and the Prince Georges County, Maryland Police Department (PGPD). MPD Sergeant L.F. and other supervisory MPD officers implemented a plan to form two officer lines: one would move rioters northward, around the corner of the building and eventually off the Upper West Terrace, *see generally* Ex. 436; the other would move rioters

westward, off the inaugural staging area. PGPD Corporal S.A. was among the officers in the police line that was tasked with moving Northwards across the Upper West Terrace.

At 4:12 p.m., as the two police lines were forming, Rumson left the Senate Wing Door area, crossed in front of the police line, and positioned himself at the front of the rowdy mob facing off with the police line. *See, e.g., id.* Rioters began fighting the officers in the line. *See* Gov. Ex. 813. Rumson joined them, darting forward and pushing against the police line for approximately fifty seconds. As the rioters clashed with the officers, Rumson was momentarily pushed backwards. He charged back at the line, where he reached up with his right hand and grabbed the face shield of Corporal S.A.'s riot helmet.



*Gov. Ex. 435: Rumson grabs Corporal S.A.'s face shield.*

Rumson yanked Corporal S.A.'s face shield downward, whipping Corporal S.A.'s head back and downward, which forced Corporal S.A. to double over in pain. *See* Gov. Ex. 810, 811, 814; *see also* Trial Tr., May 13, 2024, at 188:20-189:24. The body-worn cameras of several MPD officers near Corporal S.A. capture Rumson approaching the police line at 4:22:31 p.m. and walking away at 4:22:48 p.m. after assaulting Corporal S.A. *See, e.g.,* Gov. Ex. 814.

**B.  Rumson's Post-Arrest Interview with the FBI**

Following his arrest on February 27, 2023, Rumson was interviewed by the FBI. He stated that he travelled to D.C. with a friend who he refused to name. Rumson described attending the whole of the former President's speech before going to the Capitol. He explained he went to the Capitol to protest the Supreme Court's recent denial of certiorari in the case of *Texas v. Pennsylvania*, 141 S.Ct. 1230 (Dec. 11, 2020) (Mem.). Rumson further stated that he was familiar with the area around the Capitol because he used to live in Washington and had visited the Capitol at least seven times.[4]

When asked how he came to be in the building on January 6, Rumson falsely claimed he had been "carried" into the Capitol by the crowd, including over a railing. He further falsely stated he was unable to exit the building after being "pushed" inside. Rumson, contradicting the evidence at trial, claimed he saw officers inside the Capitol, immediately surrendered to them, and was then "beaten" by the officers. According to Rumson, he was then picked up by the crowd and carried out of the Capitol where he was released from his handcuffs. Rumson said that he next wandered around for a while with a "concussion." Later in his interview, Rumson claimed that he had bruises as a result of his confrontation with police in the Brumidi Corridor.

Rumson claimed that his memory became a little "hazy" after "being beat." After briefly talking about undercover provocateurs within the crowd who were breaking windows, Rumson began discussing the police line on the Upper West Terrace. He claimed that this police line was "smacking people" and "teargassing" them but made no mention of rioters violently resisting the

---

[4]  The government has been unable to verify Rumson's claims about having lived in the Washington, D.C., area.

police line. Rumson claimed that "he couldn't push through the police line" and that "he was being closed in" with no ability to retreat, which was directly refuted by Gov. Ex. 810. *See* Trial Tr., May 14, 2024, at 157:25-158:15 (Rumson testifies that he counts 13 or 14 people walking behind him and away from the police line in the seconds before his assault).

Initially, Rumson did not say anything about grabbing Corporal S.A.'s face shield. He instead claimed that he was hit with a stick, saw the person next to him get hit, and then "ducked down and managed to back up and get out of there" before going home to Florida. Rumson claimed that he left the Capitol via the same steps that he came up. After being asked about his reason for wearing the panda headpiece, Rumson referred the FBI to his shirt, and then acknowledged that he had a bulletproof plate in his backpack in the event that he was exposed to gunfire.

When the interviewing agents followed up and asked him about his interaction with Corporal S.A., Rumson minimized by saying that "they got engaged with each other" but he was "trying to leave" and admitted, "I might have grabbed a shield." When the agents pointedly asked him about grabbing an officer's face shield, Rumson said he did not recall doing so but that it was "possible."   He continued to insist, falsely, that the police had been the aggressors.

When he was confronted with video that showed him leaping over a rail, Rumson again falsely claimed that it showed him falling over the rail and then stumbling into the building. Rumson stated the panda head prevented him from being able to see what was happening. He minimized his conduct by claiming that it felt like he was being picked up and carried across the threshold. Rumson acknowledged that, following his interaction with police in the Brumidi Corridor, he knew he was not permitted to be at the Capitol.

Asked about his efforts to rile up the crowd outside the Senate Wing Door, Rumson flatly

denied that he ever yelled "get a ram." He claimed he said, "tell the cops you love them." When he was told by the interviewing agents that they had video of him telling the crowd to get a ram, Rumson insisted that it was someone else saying "get a ram" and that it was a "misinterpretation" of what he said. The evidence presented at trial proved all of Rumson's claims as to his conduct outside the Senate Wing Door were untrue.

### C.  Rumson's Post-Arrest Statements and Conduct

After his arrest, Rumson sought to use his status as a January 6 defendant to garner fame and notoriety. *See* Gov. Ex. 440, 441, and 444. Rumson also ran to be a county commissioner in Citrus County, Florida. As part of his stump speech, he referenced his arrest and conviction for his conduct at the Capitol on January 6. He used these public speaking opportunities and media appearances to lie about his own conduct at the Capitol and to spread false and misleading narratives about the riot.

In his first media appearances, in late March of 2023, approximately one month after he was arrested, Rumson expressed pride for his conduct on January 6. During that appearance, Rumson wore the same shirt that he wore to the Capitol on January 6, *see* Gov. Sent. Ex. A at 45:00-50:27, and claimed the police were the true aggressors on January 6.



*Gov. Sent. Ex. A: Clip from March 2023 appearance on "American Sunrise."*

13

Rumson's media tour continued in the fall of 2023 when he did a series of interviews. He prominently displayed a large panda headpiece—similar to the one that he wore to and lost at the Capitol—during some of those interviews.



*Gov. Ex. 444 at 33:49: Panda headpiece prominently displayed near a "1/6" memorial plaque.*

In the spring of 2024, Rumson ran for local political office in Citrus County, Florida. As part of his campaign, he did a number of speaking events, several of which were published online. As a candidate for political office, Rumson continued to speak publicly about the events of January 6 and began to extrapolate upon his false story about the riot, including claiming that his hand "brushed" against Corporal S.A.'s helmet "for a hundredth of a second, and they claim that that is enough to put me in jail under federal assault charges." *See* Gov. Ex. 440 (8:00 – 8:20).

Following his conviction, Rumson continued make his conduct on January 6 part of his stump speech. Now, though, he uses this stump speech to undermine public confidence in the judicial system. In July of 2024, Rumson held a rally on a street corner in Florida. As he tries to rile up the crowd Rumson announces proudly,

> But I've been fighting non-stop for two years: I had to fight the FBI—the county police; I was illegally raided; I was illegally surveilled; my house was illegally broken into. Then I had to go to D.C. to face an Orwellian trial where evidence was

14

ignored; where people's depositions were ignored; where the people who came to testify against me agreed with me; and I was still somehow found guilty."

Gov. Sent. Ex. B at 4:09-4:36.

### D. Rumson's False Trial Testimony

Rumson testified under oath at trial and repeatedly lied about material issues. Despite these statements which, if taken as true, would have provided a sufficient basis to acquit Rumson on multiple counts, the Court convicted him of each count on the indictment. Rumson's testimony is replete with lies about a myriad of topics, ranging from his ability to perceive the events around him through his panda headpiece, *see* Trial Tr., May 14, 2024, at 72:9-13, to his reasons for being at the Capitol that day, *see id.* at 69:22-25, and these lies are each material in their own way to at least one aspect of his case. However, Rumson's lies about three topics in particular necessitate special consideration.

<u>Route of Entry and Knowledge of the Vice President</u>

Rumson testified that he approached the Capitol's Upper West Terrace from the northeast corner, implying that he did not, therefore, climb the Northwest Steps amidst the violence and chaos in and around that area and the nearby scaffolding. *See* Trial Tr., May 14, 2024, at 74-75. This testimony is flatly contradicted by multiple video exhibits that depict Rumson, in his distinctive panda headpiece, on the West Front and, subsequently, climbing the Northwest stairs to the Upper West Terrace. *See* Gov. Ex. 404, 404.1, 802, 803.

This fact was material because, under the Court's bench instructions, the government had to prove that Rumson knew that a Secret Service protectee was present inside the restricted area around the Capitol. When Rumson denied climbing the Northwest steps, he was also denying that he walked near another rioter who was yelling into a megaphone that Vice President was inside

the building. *See* Gov. Ex. 404.1 at 0:29-0:50. When delivering its verdict, the Court stated it did

not credit Rumson's false testimony on this point. *See* Trial Tr., May 24, 2024, at 48:2-8 ("At

about 2:00, Rumson walked up the northwest stairs with several other rioters wearing a large panda

mask and a black T-shirt that read, 'Heaven destroy the CCP.' He traveled through the Upper West

Terrace, climbing scaffolding to participate in chants and singing of the National Anthem.").

Knowledge of the Restricted Area

Rumson also testified that he "didn't notice any signs on the way up there. There were no

barricades, no 'Do Not Trespass' [signs]. There were no fences." *See* Trial Tr., May 14, 2024, at

75:12-17. This, too, was contradicted by the video evidence, which show intact barricades on both

the West Front as well as the northeast corner of the restricted area around the time Rumson entered

restricted Capitol grounds, were that part of his testimony to have been true. *See* Gov. Ex. 114 at

00:40-00:50; *see also* Gov. Ex. 504 at 18:55-19:15.

Rumson testified that he became aware of the Parliamentarian Door breach when he "heard

some people cheering and shouting something like, 'They're letting us in. Come on in,' or

something like that." *Id.* at 78:8-12. On cross, he testified that, "I heard a couple of things like

that, 'Come on in,' or, 'Welcome,' or, 'We're going in.' I heard a bunch of different things all at

once." *Id.* at 137:6-11. Rumson's false testimony on this point was material because the

government had to prove both that he was aware that the Vice President was at the Capitol and

that he was aware that he was not permitted to be inside of the restricted area.

Rumson maintained that he was "authorized" to be on the Upper West Terrace on January

6, 2021. *See* Trial Tr., May 14, 2024, at 132:9-11. As the rioters outside the Senate Wing Door

were attempting to kick in the window, but were initially unsuccessful, Rumson turned towards

16

the crowd and yelled, "GET A RAM!" Gov. Ex. 429 at 00:12. When asked on direct to explain

that conduct, Rumson stated he was "just parroting" what someone else had said, despite that no

one else in the video is heard yelling the same directive. *See* Trial Tr., May 14, 2024, at 94:6-14.

At every turn, Rumson lied about his awareness of the riot happening around him and his

knowledge of the fact that he was trespassing. When delivering its verdict, this Court stated it did

not credit Rumson's testimony about his knowledge of the restricted area at the Capitol. *See* Trial

Tr., May 24, 2024, at 48, 51-52.

Assault on Corporal S.A.

Rumson lied about his conduct on the Upper West Terrace when he described the assault

itself. He explained his assaultive conduct as follows on direct: "I get struck in my bottom rib. And

as I'm covering my head, my hand goes kind of wild, and then I fall backwards, try to hold the

crowd back a little bit . . . His visor was already open, and my hand caught it going up." *See* Trial

Tr., May 14, 2024, at 97-98. Rumson then further testified as follows: "Q. Were you using force

against the police officers? A. No. Q. Were you trying to forcibly intimidate them? A. No. Q. Were

you trying to oppose them and stop them? A. No." *See id.* at 109:4-12. Finally, in response to

pointed questions from the Court, Rumson explained that he chose to attack the police line for a

second time, including assaulting Officer S.A., because of "hope and confusion." *See id.* 168.[5]

---

[5]      The Court: Why did you move towards the line of officers?
        Rumson: I'm not 100% certain.
        The Court: Why did you not leave before this moment?
        Jesse Rumson: Just the hope and confusion.
        The Court: So your testimony is that while all this was going on, you didn't leave
        because of hope and confusion?

Trial Tr., May 14, 2024, at 168:2-10.

This testimony was directly contradicted by many video and photographic exhibits, *see* Gov. Ex. 432-435, and by Corporal S.A.'s testimony, *see* Trial Tr., May 13, 2024, at 188:20-189:24. All this testimony was material to the government's proof of the assault charge for Rumson's conduct against Corporal S.A. The Court, correctly, did not credit Rumson's false testimony. *See* Trial Tr., May 24, 2024, at 63:6-66:8.

## III.    THE CHARGES AND TRIAL

On March 8, 2023, a grand jury returned an indictment charging Rumson with eight counts:

- Civil Disorder in violation of 18 U.S.C. § 231(a)(3);
- Assaulting, Resisting, or Impeding Certain Officer in violation of 18 U.S.C. § 111(a)(1);
- Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1);
- Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2);
- Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4);
- Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D);
- Act of Physical Violence in the Capitol Building or Grounds in violation of 40 U.S.C. § § 5104(e)(2)(F); and
- Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § § 5104(e)(2)(G).

Following a bench trial, this Court, on May 24, 2024, convicted Rumson on all counts.

## IV.    STATUTORY PENALTIES

Rumson now faces sentencing on all of the charges on the indictment. The government agrees with the U.S. Probation Office about the terms of imprisonment and supervised release that Rumson now faces on all the counts of conviction, *see* PSR ¶¶ 137-140 (terms of imprisonment) and 156-157 (terms of supervised release), as well as the possible fines, PSR ¶¶ 166-170.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

**<u>Count One:</u> 18 U.S.C. § 231(a)(3), Interfering with Law Enforcement Officials During a Civil Disorder (Obstructing, impeding, and interfering with Officer S.A.)**

Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, we use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
| Specific offense characteristic: physical contact | +3 | U.S.S.G. § 2A2.4(b)(1): The obstruction of officers "involved physical contact" and a dangerous weapon The enhancement applies even if the physical contact is not direct. *See United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000).<br><br>Here, Rumson had physical contact with Corporal S.A. when he wrenched the officer's face shield down and back. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the conduct constituted aggravated assault, so §2A2.2 applies.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony."  U.S.S.G. § 2A2.2 cmt. n.1.<br><br>Rumson's assaultive conduct was aggravated assault because it was not an end in itself, but rather was conducted with the intent to commit a felony other than the assault, namely, obstructing officers during a Civil Disorder, in violation of 18 U.S.C. § 231. |
| Base Offense Level: | 14 | U.S.S.G. §2A2.2 |
| Specific offense characteristic: bodily | +3 | U.S.S.G. § 2A2.2(b)(3)(A): "the victim sustained bodily injury." "Bodily injury" means "any significant |

| injury | | injury; e.g. an injury that is painful and obvious, or is of a type for which medical attention would ordinarily be sought." U.S.S.G. §1B1.1, cmt. n. 1(B).[6] |
| | | |
| | | Officer S.A. testified that he experienced neck pain directly due to Rumson's assault. *See* May 15, 2024 Trial Tr. at 203. |
| Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." |
| | | Rumson knew he was assaulting law enforcement officers in the Upper West Terrace police line he attacked them precisely because they were defending the Capitol from the rioters' attempts to enter and remain in the building and on the grounds. |
| Adjustment: Obstruction | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |
| | | *See discussion of Rumson's untruthful testimony, supra at 15-18.* |
| **Total** | **25** | |

---

[6] Officer S.A. testified that the pain Rumson caused continued into the evening of January 6 and that he contemplated seeking medical attention the next day, but ultimately did not, due to the paperwork involved in a worker's compensation claim. *See* May 15, 2024 Trial Tr. at 203. Courts in this District have found that pain, alone, is sufficient to establish bodily injury. *See, e.g., United States v. Easterday*, No. CR 22-404 (JEB), 2024 WL 1513527, at *7-9 (D.D.C. Apr. 8, 2024) ("Contrary to Easterday's contentions, moreover, the Court's instructions were sufficiently aligned with the widely embraced definition of bodily injury that includes simple pain. 'Injury,' the jury was charged, is 'any physical injury, however small, including a touching offensive to a person of reasonable sensibility.' 'Bodily injury,' in turn, was defined as 'an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought.' Taken together, these definitions do not convey that damage to the body must occur, nor that pain must be long-lasting to count as bodily injury.") (internal citations omitted) (emphasis in original).

**Counts Two:** **18 USC § 111(a)(1), Assaulting, Resisting or Impeding Officer S.A**

| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
|---|---|---|
| Specific offense characteristic: physical contact | +3 | U.S.S.G. § 2A2.4(b)(1). *See discussion with respect to Count One.* |
| Specific offense characteristic: bodily injury | +3 | U.S.S.G. § 2A2.2(b)(3)(A). *See discussion with respect to Count One.* |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2. *See discussion with respect to Count One.* |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Specific offense characteristic: bodily injury | +3 | U.S.S.G. § 2A2.2(b)(3)(A). *See discussion with respect to Count One.* |
| Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b). *See discussion with respect to Count One.* |
| Adjustment: Obstruction | +2 | U.S.S.G. §3C1.1. *See the discussion with respect to Count One.* |
| **Total** | **25** | |

**Count Three:** **18 U.S.C. § 1752(a)(1), Entering or Remaining in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2B2.3, which applies to trespass offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(1).

| | | |
|---|---|---|
| Base Offense Level | 4 | U.S.S.G. §2B2.3(a) |
| Specific offense characteristic: restricted grounds | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross-Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Offense Level (adjusted, from Count One) | 14 | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Rumson entered and remained in the restricted area of the U.S. Capitol grounds for the purpose of assaulting law enforcement officers who were engaged in the lawful performance of official duties during a civil disorder, in violation of 18 U.S.C. § 231(a)(3), as charged in Count One. |
| Specific offense characteristic: bodily injury | +3 | U.S.S.G. § 2A2.2(b)(3)(A).<br><br>Officer S.A. testified that he experienced neck pain directly due to Rumson's assault. *See* May 13, 2024 Trial Tr. at 203. |
| Adjustment: Obstruction | +2 | U.S.S.G. §3C1.1.<br><br>U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of |

| | | conviction and any relevant conduct; or (B) a closely related offense." *See discussion of Rumson's untruthful testimony, supra at 15-18.* |
|---|---|---|
| Total | **19** | |

## Count Four: 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2A2.4, which applies to assault offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(2).

| Base offense level | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific offense characteristic: physical contact | +3 | U.S.S.G. §2A2.4(b)(1)(A): "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by **3** levels." *See* discussion regarding physical contact above. |
| Cross Reference | | U.S.S.G. § 2A2.4(c) *See* discussion regarding Count Three |
| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) |
| Specific offense characteristic: bodily injury | +3 | U.S.S.G. § 2A2.2(b)(3)(A). *See discussion with respect to Count Three.* |
| Adjustment: Obstruction | +2 | U.S.S.G. § 3C1.1 *See discussion with respect to Count Three* |
| **Total** | **19** | |

**Count Five:** **18 U.S.C. § 1752(a)(4)— Engaging in Physical Violence in a Restricted Building or Grounds**

The Statutory Appendix lists two potentially applicable guidelines provisions for a Section 1752 offense: U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and U.S.S.G. § 2B2.3 (Trespass). The Introduction to the Appendix states that, if "more than one guideline is referenced for a particular statute, use the guideline most appropriate for offense conduct." Here, U.S.S.G. § 2A2.4, which applies to assault offenses, is the most appropriate guideline for 18 U.S.C. § 1752(a)(4).

| Base offense level | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Specific offense characteristic: physical contact | +3 | U.S.S.G. § 2A2.4(b)(1).<br><br>Rumson made physical contact with Officer S.A. by physically grabbing the face shield of his riot helmet. *See* Gov. Ex. 810, 811, and 814. |
| Specific offense characteristic: bodily injury | +2 | U.S.S.G. §2A2.4(b)(2): If the victim sustained bodily injury, add 2 levels.<br><br>Officer S.A. testified that he experienced neck pain directly due to Rumson's assault. *See* May 15, 2024 Trial Tr. at 203. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the conduct constituted aggravated assault, so §2A2.2 applies.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>Rumson's act of physical violence constituted aggravated assault because it was not an end in itself, but rather was conducted with the intent to commit a felony other than the assault, namely, obstructing officers during a Civil Disorder, in violation of 18 U.S.C. § 231. |
| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) |
| Specific offense characteristic: bodily injury | +3 | U.S.S.G. § 2A2.2(b)(3)(A)<br><br>Officer S.A. testified that he experienced neck pain directly |

24

| | | due to Rumson's assault. *See* May 15, 2024 Trial Tr. at 203. |
|---|---|---|
| Adjustment: Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b).<br><br>Rumson knew he was assaulting law enforcement officers in the Upper West Terrace police line he attacked them precisely because they were defending the Capitol from the rioters' attempts to enter and remain in the building and on the grounds. |
| Adjustment: Obstruction | +2 | U.S.S.G. §3C1.1.<br><br>*See the discussion with respect to Count Three.* |
| **Total** | **25** | |

**Counts Six through Eight: Disorderly conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F); Parading, demonstrating, or picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).**

Because these offenses are Class B misdemeanors, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

<u>Criminal History Category and Grouping Analysis</u>

Pursuant to U.S.S.G. § 3D1.2, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." Accordingly, all of Rumson's offenses group here. In the first instance, Count One (18 U.S.C. § 231(a)(3)), Count Two (18 U.S.C. § 111(a)(1)), and Count Five (18 U.SC. § 1752(a)(4)) group pursuant to U.S.S.G § 3D1.2(a), because they involve the same victim (Officer S.A.) and the same act or transaction. Similarly, Count Three (18 U.S.C. § 1752(a)(1)) and Count Four (18 U.S.C. § 1752(a)(2)) also initially group pursuant to U.S.S.G. § 3D1.2(b), because they involve the same victim (Congress) and two or more acts or transactions connected by a common criminal objective. Furthermore, all counts then group, pursuant to U.S.S.G § 3D1.2(c), because the assault causing bodily injury (Count Two) embodies conduct that

is treated as a specific offense characteristic (bodily injury) to all other counts.

The offense level for that single Group would then be the highest offense level of the counts in the Group (offense level 25), pursuant to U.S.S.G. § 3D1.3(a). Pursuant to USSG § 3D1.4(a), 1 unit is assigned for the Group (U.S.S.G. § 3D1.4(a)), and no offense levels are added (U.S.S.G. § 3D1.4). The combined offense level is therefore 25. The Probation Office has calculated Rumson to have a criminal history category of I, which is not disputed. Therefore, Rumson's guidelines custodial range 57 to 71 months.

Section 4C1.1 does not apply in this case. Rumson personally used physical violence during his offenses. He purposefully and forcefully interfered with Corporal S.A.'s during the course of a violent riot and while the corporal was attempting to clear rioters from the Upper West Terrace. Rumson's offense, therefore involved the use of physical violence and any adjustment under § 4C1.1 does not apply to his conduct. *See United States v. Bauer*, 21-cr-386-2 (TNM), ECF 195 at 4-5 (Defining "violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm."); *see also United States v. Hernandez*, 21-cr-445 (CKK), ECF 65 at 5 (adopting Judge McFadden's definition of violence from *Bauer*).

Accordingly, based on the government's calculation of Rumson's total adjusted offense level at 25, Rumson's Guidelines imprisonment range is 57 to 71 months' imprisonment.

## VI.     THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Rumson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Rumson breached the secure area around the United States Capitol and ascended the Northwest Steps into the scene of an active riot. He was one of the first rioters to enter the building at the Parliamentarian Door and was handcuffed, taken into custody, and searched there because of his riotous conduct against police officers. Rumson's conduct in the Brumidi Corridor distinguishes him from other rioters in that area. Although many rioters resisted police, only Rumson's conduct was so egregious at that moment that it required him to be seized, handcuffed, and searched. While we do not know the precise conduct that Rumson engaged in inside of the Brumidi Corridor, the fact that he was detained and handcuffed indicates that he—in the midst of a violent riot—was engaging in particular disruptive or violent conduct at that moment. Back on the Upper West Terrace, after ninety minutes of harassing and heckling police officers near the Senate Wing Door, he grabbed the face shield of Corporal S.A. and yanked it violently. The nature and circumstances of Rumson's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 66 months.

### B.  The History and Characteristics of the Defendant

Rumson, a 38-year-old former comic bookstore manager who presently works part time with his romantic partner at her house cleaning business, PSR ¶ 118-120, has had minor interactions with the criminal justice system, *id.* at ¶ 83, 91. Rumson, despite having only had relatively minor run-ins with the law in the past, decided on January 6, 2021, to join a riot to

accomplish his political ends. In furtherance of that end, he came to Washington prepared for the potential of violence with bullet proof plate carriers in his backpack. During his testimony repeatedly professed that he adhered strictly to non-violent principles. *See, e.g.,* Trial Tr. May 14, 2024, at 68:3-2. But, Rumson called to the crowd to "get a ram" to break down the barricades near the Senate Wing Door, *see* Gov. Ex. 429 at 0:06-0:13, and threatened the police guarding that door that they need to join the rioters "or die," Gov. Ex. 430 at 0:49-1:09. Moreover, he violated both the law and his own professed non-violence when he assaulted Corporal S.A. Rumson's deeds at the Capitol diverge sharply with the non-violent person who he represented himself as during his testimony and in his public media appearances. Furthermore, Rumson's behavior at trial is also demonstrative of who he is. Rumson took the stand and perjured himself repeatedly. Even when confronted with direct evidence that he was lying, he repeated and often doubled down on his lies. In telling these blatant lies, he demonstrated that he has no respect for the criminal process or the seriousness of these proceedings. He has since echoed these same lies in media interviews. While Rumson may have lived an otherwise uneventful life, his violent conduct on January 6, refusal to abide by lawful orders, and the clear pride that he still takes in having committed these crimes weighs heavily in favor of a term of incarceration at the high end of his guidelines range.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rumson's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was

was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

DA significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration at the upper end of Rumson's guidelines range. On January 6 and through to today, Rumson has shown himself time and time again to not be someone who is easily deterred. Rumson eagerly entered the scene of a violent riot and leapt over a railing at his first opportunity to breach the Capitol. Even being placed into handcuffs and taken into custody could not deter him from taking whatever steps were necessary to achieve his unlawful ends. After being released from his handcuffs, he again joined the riot and called for a ram while threatening the police with bodily harm if they did not turn their backs on their sworn duties to defend the Capitol and join the rioters. Finally, when a police line began moving across the Upper West Terrace, Rumson harried the line of officers for fifty seconds before leaping into the fray and ripping at Corporal S.A.'s face shield.

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

While Rumson's conduct on January 6 alone is sufficient to show that he is dearly in need of specific deterrence, his conduct since his arrest and conviction is even more evidence of the need for specific deterrence in this case. In his media interviews following his arrest, Rumson has demonstrated that he does not believe he did anything wrong on January 6. The tokens that Rumson elected to display in the background of these interviews, including the duplicate of the panda headpiece he wore to the Capitol and a "1/6" memorial plaque, are further evidence of his lack of remorse and—in fact—pride in his illegal conduct.

Since his arrest, Rumson has trumpeted and celebrated his actions as patriotic, heroic, and honorable, while constructing a narrative around himself that he is the victim who is standing up to a system that it intended to harm him without due process. Rumson has used his crimes to bring himself notoriety among those who propound alternative, dishonest narratives about January 6. Since his conviction, Rumson's expressions of pride in his conduct have only grown more verbose and fiery. In his July 2024 speech, Rumson yelled to the crowd about the unfair of the criminal justice system. In this speech he described this Court's process and verdict as "Orwellian" and lamented some unspecified "evidence" that the court ignored to find Rumson guilty.

Rumson's unwillingness to acknowledge the wrongfulness of his conduct and his increasingly impassioned expressions of pride in his conduct, demonstrate that he is dearly in need of specific deterrence. The Court should sentence Rumson in a way that specifically deters him from ever engaging in this type of political violence ever again.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*,

671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] In advance of sentencing in this matter, the Court advised the parties to consider primarily cases that have been sentenced by this Court. The government has endeavored to compare Rumson's

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

conduct to prior cases sentenced by this Court, but also to provide an additional case for the Court's consideration. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Richard Harris*, 21-cr-189 (CJN), the defendant, like Rumson, entered the Capitol Building, but, unlike Rumson, remained in the Capitol for more than an hour. Unlike Rumson, Harris' conduct inside the Capitol did not result in him being handcuffed. Like Rumson, Harris had at least two direct interactions with police officers at the Capitol, but, unlike Rumson, Harris was charged with assault for both interactions. Both Harris and Rumson yelled out to the crowd to rile them up and advance the will of the mob and heckled police officers. Like Rumson, Harris caused an injury as a result of one of his assaults against a police officer. Both Harris and Rumson had to be physically pushed from the Capitol grounds by an overwhelming show of police force. Like Rumson, Harris refused to accept responsibility and put the government to its burden in a bench trial. But, unlike Rumson, Harris did not testify in his own defense or perjure himself. Harris, like Rumson, gave a media interview in which he minimized his conduct and represented himself as the victim of January 6, but Harris' media appearances were limited to one post-trial rather than several spread out for the life of the case. This Court calculated Harris' guidelines range to be 57-71 months at an offense level of 25, the same as the government (and Probation, *see* PSR ¶ 81) has calculated for Rumson. This Court varied downward and sentenced Harris to 41 months of incarceration.

On balance, Rumson's conduct is worse than Harris's. Rumson's decision to take the stand and perjure himself, unlike Harris, is a highly significant aggravating factor. Additionally, unlike

Harris, Rumson came prepared for violence by bringing ballistic plates with him to the Capitol. By wearing the panda headpiece during the riot, Rumson sought to prevent himself from being identified while he joined the riot. Unlike many January 6 defendants, Rumson admittedly had an "idyllic childhood" in a "beautiful neighborhood," PSR ¶ 98. Both sets of grandparents lived near his family home, and he experienced no physical or substance abuse. Id. He had numerous friends as a child. *Id.* There appear to be no grounds for a downward variance.

In *United States v. Kenneth Thomas*, 21-cr-552 (DLF), the defendant, like Rumson, made his way to the front of the riot on the West Front, despite seeing signs that the police were being overrun. Like Rumson, Thomas was on the Upper West Terrace of the Capitol. Unlike Rumson, Thomas never entered the building and did not attempt to obscure his identity. Thomas, unlike Rumson, attempted to run through a police line on the Upper West Terrace at 3:30 p.m. and, in doing so, made physical contact with two police officers in this line. Both Thomas and Rumson called out to rally the crowd around them. At 4:20 p.m., Rumson and Thomas were part of the same scrum line that was resisting the efforts of police officers to clear the Terrace and both harassed and harried officers in the line. Thomas was convicted of assaulting two officers during his fight against the police line.[10] Rumson, unlike Thomas, injured a police officer as a direct result of his assaultive conduct against the police line. Both Rumson and Thomas took the stand in their own defense and perjured themselves. Also like Rumson, Thomas expressed no remorse for his crimes, continued to refuse to accept responsibility for his actions, portrayed himself as the true victim of the events of January 6, and made repeated public statements in which he denied

---

[10] Thomas was charged with assaulting three officers as the police line was attempting to clear the Upper West Terrace but convicted of two. The Thomas jury hung on one assault charge that involved Corporal S.A., the same officer who Rumson assaulted.

and minimized the conduct for which he had been convicted while casting aspersions upon the judicial process, but Thomas' public statements were far greater in number, duration, and scale than Rumson's. Thomas, unlike Rumson, had had a difficult upbringing and early adulthood. Judge Friedrich sentenced Thomas to 58 months of imprisonment.

On balance, Rumson's conduct was worse than Thomas'. First and foremost, Rumson's assault on Corporal S.A. caused an injury to the Corporal's neck, whereas none of Thomas' four assault convictions resulted in a direct physical injury to an officer. Second, Rumson entered the building and took efforts to obscure his identity in doing so, whereas Thomas never entered the building and had his face plainly visible during the entire riot. Thomas' conduct against police officers, although very serious, never resulted in him being detained by the police during the riot. Rumson's conduct was so egregious that it did require the police to take such action. Third, whereas Thomas' calls to the crowd on the Upper West Terrace were intended to motivate the crowd in resisting the police efforts and to harass the officers, Rumson's calls outside the Senate Wing Door were intended to compel the crowd to take a direct and concrete action—getting a battering ram—that would result in another breach of the building. While Thomas's conduct was extremely serious and merited every day of his 58-month sentence, Rumson's conduct during the riot was worse than Thomas' and merits a sentence more serious than Thomas'.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Rumson was convicted of a violation of an offense under Title 18, and the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of

loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Because Rumson engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Rumson to pay $2,000 in restitution for his

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

convictions. This amount fairly reflects Rumson's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. § 231(a) and 18 U.S.C. § 111(a)(1) subject him to a maximum fine of $125,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. [12] *See United States v. Gewin*,

---

[12] Rumson has engaged in limited fundraising, receiving approximately $1,760 in donations to a GiveSendGo account. In this case, he was represented by three retained attorneys, but did not provide any information about his legal fees or how he was paying them. PSR ¶ 127. Based the PSR, it appears that Rumson only provided self-reported earnings and not any bank statements or other financial disclosures. He also refused to sign a release, so the Probation Office was unable to review any credit history. *Id.* at ¶ 133. He did not provide documentation about the value of his vehicles, leaving the Probation Office to estimate the value of his two cars. *Id.* at ¶ 129. Interestingly, he only reported having cash assets valued at $1,000 in a campaign account, *id.* at ¶ 128, but then went on to report having some $150,000 in non-cash assets in the form of $70,000 in comic books and collectibles, $3,000 in guns (Rumson's conditions of release prohibit him from possessing a firearm, ECF 11 at ¶ 7(k), and—having been convicted of multiple federal offenses—is now prohibited from doing so under 18 U.S.C. § 922(g)), and $30,000 in cars, PSR at ¶ 132. He has not filed taxes since 2022. *Id.* at ¶ 135. While the government understands that the Probation Office concluded that Rumson does not have the ability to pay a fine, the government submits that there may be more to his financial situation than meets the eye or than he is willing to disclose. It is the defendant's burden to show that he has an inability to pay a fine. *Gewin*, 471 F.3d at 203. Rumson's refusal to cooperate fully with the investigation into finances and contradictory

471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 66-months of incarceration, thirty-six months of supervised release, $2,000 restitution, and a special assessment of $285.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

---

disclosures indicate that he has not met that burden. The Court should, therefore, consider imposing a fine in this case. *See United States v. Ryan Nichols*, 21-cr-117 (RCL), ECF 307 (imposing a $200,000 fine on a January 6 defendant who engaged in prodigious fundraising but refused to cooperate with Probation office's investigation into his finances); *see also United States v. Rebecca Lavrenz*, 23-cr-66 (ZMF), ECF 99 (imposing a $103,000 fine for another January 6 defendant who refused to cooperate with the Probation investigation into her finances and extensive fundraising).